Donald Richard **MUNROE**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

Marian B. **MUNROE**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

Nos. 121, 122–69.

United States Court of Appeals,
Tenth Circuit.

April 7, 1970.

Fred T. Hensley, Portales, N. M., for appellants.

Victor R. Ortega, U. S. Atty. (and John A. Babington, Asst. U. S. Atty., Albuquerque, N. M., on the brief), for appellee.

Before MURRAH, Chief Judge, and LEWIS, BREITENSTEIN, HILL, SETH, HICKEY and HOLLOWAY, Circuit Judges.

HILL, Circuit Judge.

Appellants are husband and wife and each is a licensed osteopathic physician in the State of New Mexico. They were convicted by a jury on separate counts of an information charging the unlawful sale of amphetamine tablets, a "stimulant drug" within the meaning of 21 U.S.C. § 321(v) (2), in violation of 21 U.S.C.

§ 331(q) (2). These are direct appeals from those convictions.

Evidence on behalf of the government shows that on November 2, 1966, at about 12:30 A.M., James Wilson, acting as an undercover agent for the New Mexico State Police, and one Ray Shipplett drove in Shipplett's car to the home of appellants in Portales, New Mexico. Shipplett first went into the home and in a few minutes returned to the car and told Wilson to come into the house with him. Inside the house Shipplett and Wilson purchased two thousand ten milligram amphetamine tablets from Donald Munroe at a price of seventy-five dollars per thousand, the same being paid by Shipplett with money previously furnished to him by Wilson. After paying the money Shipplett picked up the paper sack containing the tablets, handed it to Wilson and the two left the house. Donald Munroe's conviction was based on this transaction.

The government's evidence further shows that on March 24, 1967, Donald G. Bramwell, an Agent with the Bureau of Narcotics and Dangerous Drugs, at Lubbock, Texas, called the Munroe home in Portales by telephone and talked with appellant Marian Munroe. He represented himself to be one Fred Shockley, an acquaintance of the Munroes. He advised Mrs. Munroe that he wanted to buy three thousand "red bird" tablets. "Red bird" is a slang term for seconal capsules, a barbiturate. She cautioned him "not to talk that way over the telephone" but if he wanted to talk to her to come to Portales and see her. Bramwell then advised her that he would be there at 10:00 o'clock that night. Later that day Bramwell advised Mrs. Munroe that he would be in Portales the following evening at 10:00 o'clock. On the night of March 25, Bramwell went to the Munroe home, was admitted by Mrs. Munroe and after some conversation about the man,

Fred Shockley, Mrs. Munroe sold Bramwell 3000 amphetamine tablets at a price of one hundred dollars per thousand. On this occasion Bramwell told Mrs. Munroe that he was picking up the tablets for Fred Shockley.

At the trial the appellants, in effect, admitted each of the sales but denied that they were guilty of the crimes charged. They contended that each sale was made in their professional capacities and were not violations of the law. In the alternative they contended that if the sales were in violation of law, that they had been entrapped by Wilson and Bramwell into making such illegal sales. At the trial they timely objected to the giving of an "Allen" type instruction to the jury.

To support the legality of the sales Donald Munroe testified that both Shipplett and Shockley were former patients; that both were engaged in the horse racing business; that the tablets, on both occasions, were sold for use by the buyer in such business; and, that many racers gave their horses such "stimulant drugs."

At the close of the case, counsel for Munroes requested the giving of an instruction to the jury on the defense of entrapment, which request was refused. The law is well settled in this circuit that if the defendant denies the commission of the crime charged, the defense of entrapment is not available to him.[1] Appellants urge that, in this case, because they do not deny the making of the sales, although they do deny the illegality of the sales, the above entrapment rule should not be applied. We cannot agree. One of the reasons for the rule lies in the inconsistency between a denial of guilt and the defense of entrapment.[2] That same inconsistency exists here as between appellants' claim that the sales were legally made and the defense of entrapment. It should also be noted that, under the law, appellants could legally

1. Rowlette v. United States, 392 F.2d 437 (10th Cir. 1968); Martinez v. United States, 373 F.2d 810 (10th Cir. 1967).

2. United States v. Freeman, 412 F.2d 1181 (10th Cir. 1969); Ortega v. United States, 348 F.2d 874 (9th Cir. 1965); Sears v. United States, 343 F.2d 139 (5th Cir. 1965).

dispense "stimulant drugs" to their patients but it is preposterous to argue that the selling of amphetamine tablets in quantities of two and three thousand tablets was being done in the regular course of their professional practice. It is also absurd to argue that the selling of such tablets to someone for use as horse medicine is within the appellants' authorized professional handling of "stimulant drugs."

Moreover, we have not only read the appendix prepared in this case but we have carefully read the entire trial transcript. We can find no evidence in the case to support the defense of entrapment even if we could say such defense was available. On the Wilson count, he did not wear his uniform when he went to the Munroe home with Shipplett but was dressed in old clothes, he had grease on his hands and under his fingernails, he acted like he had been drinking and posed as Shipplett's partner. In the Bramwell count, the Agent, talking with Marian Munroe on the telephone, represented himself as Fred Shockley and thereafter at the Munroe home told Marian Munroe he was picking up the tablets for Shockley. Under the cases cited above, these representations and circumstances fall far short of the required showing to establish entrapment.[3]

At the conclusion of the trial the jury was instructed and, at 2:56 o'clock P.M., sent to the jury room to commence deliberations. Near the end of the court day and at 4:45 o'clock P.M., without any request or communication from the jury, the trial judge advised counsel that he proposed to bring the jury in to determine what progress, if any, it had made. The jury was brought back to the courtroom and from careful and judicious questioning by the judge, he learned that the jury was not deadlocked, progress had been made and some parts of the whole verdict actually agreed upon. At this point the jury simply had not finished its deliberations.

The trial judge then proceeded to give the jury an additional charge. At the outset he advised them that all of the original instructions given were to be just as fully considered as if he again gave those instructions. He proceeded to again instruct them fully on presumption of innocence, burden of proof and reasonable doubt. He then gave the jury an "Allen" type instruction.[4] The jury

---

3. *See also* Harris v. United States, 402 F. 2d 464 (10th Cir. 1968); Wolford v. United States, 401 F.2d 331 (10th Cir. 1968); McCarthy v. United States, 399 F.2d 708 (10th Cir. 1968).

4. "Now, ladies and gentlemen, if you should fail to agree on a verdict as to a particular Count as to one of the defendants, to that extent the case is left open and undecided. Now there appears to be no reason to believe that another trial would be more carefully or better presented. There is no reason to believe that the case can be tried again more exhaustively or better than it has been tried here. Any future jury must be selected in the same manner and from the same sources as you have been selected. So there appears to be no reason to believe that the case would ever be presented to twelve men and women more conscientious, more impartial or more competent to decide it, or that more or clearer evidence could be produced on either side.

"Now, I think it's unnecessary to add, as I told you before, I do not wish and

I do not suggest for a moment, that any juror should surrender his or her conscientious conviction solely because of the opinion of other jurors, or for the mere purpose of returning a verdict. However, it is your duty, as jurors, to consult with one another, and to deliberate with a view to reach an agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but you should do so only after a consideration of the evidence with all of your fellow jurors, and in the course of your deliberations you should not hesitate to change your opinion when you're convinced it's erroneous.

"Now, if much the greater number of you are for a conviction as to a particular Count, each dissenting juror ought to consider whether a doubt in his or her own mind is a reasonable one, since it makes no effective impression upon the minds of so many equally honest, equally intelligent fellow jurors, and if, on the other hand, a majority

returned to the jury room at 5:01 o'clock and in about forty minutes returned to the courtroom with a complete verdict on each of the three counts of the information. Both defendants were acquitted on the first count, in which they were charged jointly, and each was convicted on a separate count, counts 2 and 3, which charged individual crimes.

Appellants lastly urge trial error because of the giving of the supplemental instructions during the course of the jury deliberations. To this date this court has not, as a general rule, condemned the giving of supplemental jury instructions or struck down the giving of the so-called "Allen" type instruction. The court has made a case by case examination to determine whether the taint of coercion was present. In some instances, by reason of the coercive nature of the language used in giving such an instruction, cases have been reversed.[5] In more recent cases, the trial courts have been advised that the giving of such an instruction before the jury commenced to deliberate instead of during the course of the deliberations is preferable.[6] In United States v. Winn, 411 F.2d 415 (10th Cir. 1969), Chief Judge Murrah stated, "* * * we have said more than once that an instruction of this kind would be more 'appropriately influential and far less vulnerable to the charge of coercion' if given before the jury initially retires." After considering the wording of the instruction given in that case, the colloquy between the trial judge and the jury foreman and all of the circumstances surrounding the giving of the instruction, the court concluded that the language used was not coercive and affirmed the conviction. In United States v. Wynn, 415 F.2d 135 (10th Cir. 1969), the court again reiterated the suggestion by saying "But we again call attention to the inherent danger in this type of instruction when given to an apparently deadlocked jury and reiterate the suggestion that, if it is given at all, it be incorporated in the body of the original instructions. We make this in the form of a suggestion, confident, it will be heeded in the conduct of future jury trials." In that case the court concluded coercion was not present and affirmed the conviction.

As we did in United States v. Wynn, supra, recognition should be given here to the American Bar Association Standards on Criminal Justice Relating to Trial by Jury, Part V, Jury Deliberations and Verdict, § 5.4(a) and (b), which are fully set out in footnote 1 to that opinion. 5.4(a) delineates generally the type of an instruction that should be given to the jury concerning its deliberations before it retires. 5.4(b), in effect, approves the giving or repeating of such type of instruction after "* * * it appears to the court that the jury has been unable to agree, * * *."

Appellant specifically urges the supplemental instructions given here were coercive because they "failed to charge the jurors that it was their duty to dissent even if they were in the minority." Admittedly this precise language was not used by the trial judge but he did say in addition to what we have pointed out above "* * * no juror is expected to yield a conscientious conviction he or she

---

or even a lesser number, are for acquittal, the other jurors ought seriously to ask themselves whether you have reason to doubt the correctness of your judgment in the light of the other jurors who remain unconvinced beyond a reasonable doubt as to that particular Count.

"Now remember at all times, ladies and gentlemen, that no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of the evidence. But remember also, that after full deliberation and consideration of all the evidence, it is your duty to

agree upon a verdict if you can do so without violating your individual judgment and your conscience."

5. *E. g.* Burroughs v. United States, 365 F. 2d 431 (10th Cir. 1966); Berger v. United States, 62 F.2d 438 (10th Cir. 1932).

6. United States v. Wynn, 415 F.2d 135 (10th Cir. 1969); United States v. Winn, 411 F.2d 415 (10th Cir. 1969); Burroughs v. United States, 365 F.2d 431 (10th Cir. 1966).

may have as to the weight or effect of the evidence." At another point he said " * * * I do not suggest for a moment, that any juror should surrender his or her conscientious conviction solely because of the opinion of other jurors, or for the mere purpose of returning a verdict."

 The instruction given here is not a typical "Allen" instruction.[7] In the Allen case the instruction stated in part, "if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one * * *. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority." That instruction unequivocally put the burden of re-examination upon the minority. Unlike Allen, the instructions given here, in effect, were directed at both, the minority and majority, and in addition included the supplemental instructions originally given to the jury on presumption of innocence, burden of proof and reasonable doubt. As noted above, there is nothing in the record to indicate that the jury in this case was deadlocked when the supplemental instructions were given. To the contrary, the foreman of the jury advised the trial judge that the jury was making progress in its deliberations and in fact had reached verdicts on two of the three counts charged.

After carefully considering all of the supplemental instructions given in this case, together with the circumstances surrounding the giving of such instructions and in light of the decided cases of this court, we cannot conclude that the giving of such instructions was in any manner coercive.

In conclusion, we again admonish the trial judges of this Circuit that in order to eliminate any possible claim of coercion by the giving of instructions such as we have discussed here, heed should be given to the suggestions contained in United States v. Winn, supra, and United States v. Wynn, supra. In addition, we believe that § 5.4(a) and (b) of the Jury Trial Standards discussed above provide proper safeguards against the possible taint of coercion from the giving of supplemental jury instructions.

Affirmed.

7. Allen v. United States, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528 (1896).