**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Danny Ray PORTER,**
**Defendant–Appellant.**

No. 88–1558.

United States Court of Appeals,
Tenth Circuit.

July 28, 1989.

Frances Smylie Brown (Michael G. Katz, Federal Public Defender, with her on the brief), Asst. Federal Public Defender, Denver, Colo., for defendant-appellant.

Emily Metzger (Benjamin L. Burgess, Jr., U.S. Atty., with her on the brief), Asst. U.S. Atty., Wichita, Kan., for plaintiff-appellee.

Before MOORE, TACHA and BRORBY, Circuit Judges.

TACHA, Circuit Judge.

Danny Ray Porter appeals from his conviction of bank burglary in the United States District Court for the District of Kansas. On appeal, Porter challenges the trial court's refusal to admit certain hearsay testimony, the admission of other bad acts evidence, and the giving of an *Allen* instruction. Porter further asserts that the evidence is insufficient to support his conviction. We affirm.

## I.

This case arises out of the following incidents:

*Farmers State Bank Burglary.* At approximately 4:25 A.M. on June 22, 1987, the Farmers State Bank in Beaver, Kansas, was burglarized. The perpetrators had cut the telephone and alarm wires leading into the bank and gained entry by forcing open a door. The bank's vault was cut open with an acetylene torch that had been stolen from a nearby business. Approximately $35,000 in currency and $150 in silver half-dollars was taken from the bank. Included in the money taken were twenty-five marked, one-dollar bills that were to be used as bait bills in the event of a robbery. The bank kept the serial numbers of the bait bills recorded for identification purposes.

*Hudson State Bank Burglary.* On the morning of August 27, 1987, the executive vice-president of Hudson State Bank arrived at the bank and discovered that it had been burglarized. Evidence of the break-in was similar to that at the Farmers State Bank burglary, as the perpetrators cut alarm wires prior to entering the bank and used an acetylene torch to break into the vault and safety deposit boxes. Approximately $531 in coins was taken from the vault, and the contents of several safety deposit boxes were removed.

*Mayfield, Kansas, Grocery Store Attempted Burglary.* Early in the morning of September 13, 1987, an alarm connected to the home telephone of Deputy Sheriff Richard Goodrum indicated that a burglary was in progress at the Mayfield, Kansas, grocery store. Goodrum proceeded to the grocery store with his vehicle lights off and saw two people come around the side of the building. He pursued them with his bright-beam headlights on, and from a distance of approximately twenty feet, he observed two men as they arose from behind some barrels and fled.

Additional officers soon joined the pursuit. As they were looking for the two suspects, they discovered a Silverado pickup truck parked near a dirt road approximately three-quarters of a mile from the grocery store. The officers used a jim tool to open the locked truck. Inside the truck they found, among other things, two wallets, which respectively contained the driver's licenses of Dick and Danny Porter. Deputy Sheriff Goodrum subsequently identified the men he had seen running from the store as the same men whose pictures appeared on the driver's licenses. The local sheriff then contacted the FBI.

An FBI agent conducted an investigation of the contents of the truck. The agent discovered that the wallet belonging to Dick Porter contained a silver certificate one-dollar bill with a serial number matching a number on the bait bill list from Farmers State Bank. Other evidence linking the occupants of the truck to the bank burglaries included a police scanner, a scanner book containing information regarding the radio frequencies used by law enforcement officers in various locales, a revolver, and a map cut out from a newspaper article detailing a series of burglaries of rural Kansas banks. Further investigation at the grocery store revealed that, as in the previous bank burglaries, the perpetrators had cut alarm wires leading into the building.

An information filed September 17, 1987, charged Danny and Dick Porter with two

counts of violating 18 U.S.C. § 2113[1] and 18 U.S.C. § 2[2] in connection with the burglaries of the Farmers and Hudson state banks. FBI agents arrested Danny Porter on September 28, 1987, but Dick Porter evaded arrest. Dick Porter was subsequently shot and killed by FBI agents as he allegedly attempted to run over an FBI agent while fleeing his wife's residence.

The trial of Danny Porter commenced on January 26, 1988, and concluded on February 4, 1988, when the jury returned a verdict of guilty on Count I of the indictment—the Farmers State Bank burglary charge—and a verdict of not guilty on Count II—the Hudson State Bank burglary charge. This appeal followed.

## II.

Porter contends that the district court erred by refusing to admit certain hearsay statements on behalf of the defense after allowing the prosecution to introduce hearsay statements in its case-in-chief. At trial the prosecution called Dick Porter's wife, Stephanie, who testified to numerous statements previously made by Dick, including statements regarding Dick and Danny's involvement in the Farmers State Bank, Hudson State Bank, and Mayfield grocery store incidents. The court, over objection, allowed such testimony into evidence, although it was unclear at that time whether such allowance was under rules 801 or 804 of the Federal Rules of Evidence.[3]

The district court refused, however, to allow certain evidence proffered by the defense regarding Dick Porter's statements to the Porters' sister, Trina Smith. The court allowed Trina to testify to Dick's statement that he and Stephanie had "hit" the Farmers and Hudson state banks, but refused to admit Dick's statement exculpating Danny from involvement in those burglaries. The defense proffered that Trina Smith would have testified that when she asked Dick whether he had any messages for Danny, Dick told her to tell Danny not to plea bargain because Danny "should not have to do time when he has done nothing."

The court ruled that Dick's statements to Trina were severable for evidentiary purposes. The court allowed Trina to testify regarding the inculpatory statement made

1. Section 2113 provides in relevant part:
 Whoever enters or attempts to enter any bank ... or any building used in whole or in part as a bank ... with intent to commit in such bank ... or part thereof, so used, any felony affecting such bank ... and in violation of any statute of the United States, or any larceny—
 Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.
 18 U.S.C. § 2113(a).

2. Section 2 provides:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
 18 U.S.C. § 2.

3. The court later clarified its position and stated that the statements were admitted into evidence because they did not constitute hearsay within the meaning of rule 801. Rule 801 provides in relevant part:
 (d) **Statements which are not hearsay.** A statement is not hearsay if—
 . . . .
 (2) **Admission by party-opponent.** The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.
 Fed.R.Evid. 801. Although the district court did not state the precise basis for its conclusion that Dick Porter's statements were nonhearsay, the court apparently relied upon rule 801(d)(2)(E), as this is the only plausible theory here to admit the statements of a nonparty out-of-court declarant. To the extent that Stephanie Porter's testimony includes Dick's statements regarding criminal activity in which Dick and Danny participated jointly, such statements may also have qualified as statements against interest which, although hearsay, are admissible under rule 804(b)(3).

by Dick, apparently because it qualified under the statement against interest exception to the hearsay rule. *See* Fed.R.Evid. 804(b)(3).[4] The court ruled that the rest of Dick's statements to Trina, including the statement indicating that Danny was innocent, were inadmissible hearsay. Porter argues that the trial court erred in making this distinction because Dick's declaration of Danny's innocence was background information and necessarily part of Dick's statement against interest.

"In reviewing the evidentiary determinations of a trial court, we may not reverse in the absence of an abuse of discretion." *United States v. Alexander*, 849 F.2d 1293, 1301 (10th Cir.1988). "The need for deference to a trial court ruling on a hearsay objection is particularly great because the determination of whether certain evidence is hearsay rests heavily upon the facts of a particular case." *United States v. Rodriguez–Pando*, 841 F.2d 1014, 1018 (10th Cir. 1988); *see also United States v. Ospina*, 739 F.2d 448, 452 (9th Cir.1984), *cert. denied*, 471 U.S. 1126, 105 S.Ct. 2658, 86 L.Ed.2d 274 (1985) ("The determination of admissibility of statements against penal interest under Evidence Rule 804(b)(3) is committed to the sound discretion of the trial court, and should not be disturbed on appeal absent an abuse of discretion.").

In order to admit hearsay evidence offered to exculpate the accused under rule 804(b)(3), the proponent of the evidence must show: (1) an unavailable declarant; (2) a statement against penal interest; and (3) sufficient corroboration to indicate the trustworthiness of the statement. *See United States v. Lopez*, 777 F.2d 543, 554 (10th Cir.1985). Here, the declarant was dead at the time of the trial so there was no question of unavailability regarding any of his statements. Not all of Dick's

statements satisfy the second and third requirements for admission under rule 804(b)(3), however, and the district court correctly distinguished Dick's statements on this basis for the purpose of determining their admissibility.

In *United States v. Lilley*, 581 F.2d 182, 188 (8th Cir.1978), the court similarly separated portions of a declarant's statement for the purpose of determining which portions qualified as statements against interest admissible under rule 804(b)(3). The court first noted that three possible methods exist to handle statements containing both self-serving or neutral facts and facts that are against the penal interest of the declarant:

"First, admit the entire declaration because part is disserving and hence by a kind of contagion of truthfulness, all will be trustworthy. Second, compare the strength of the self-serving interest and the disserving interest in making the statement as a whole, and admit it all if the disserving interest preponderates, and exclude it all if the self-serving interest is greater. Third, admit the disserving parts of the declaration, and exclude the self-serving parts. The third solution seems the most realistic method of adjusting admissibility to trustworthiness, where the serving and disserving parts can be severed."

*Lilley*, 581 F.2d at 188 (quoting *McCormick's Handbook of the Law of Evidence* § 279, at 677 (E. Cleary 2d ed. 1972)). The court went on to adopt the third solution:

The restriction advocated by McCormick excluding portions of statements which are not against the declarant's interest is in keeping with the reasoning behind the 804(b)(3) exception to the hearsay rule. Rule 804(b)(3) is based on the guaranty

---

4. Rule 804 provides in relevant part:

 (b) **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

 . . . .

 (3) **Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability,

or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
Fed.R.Evid. 804(b).

of trustworthiness which accompanies a statement against interest. *To the extent that a statement is not against the declarant's interest, the guaranty of trustworthiness does not exist and that portion of the statement should be excluded.*

*Id.* (emphasis added).

Thus, to the extent that a statement not against the declarant's interest is severable from other statements satisfying 804(b)(3), *see id.*, such statement should be excluded. Here, Dick's statement exculpating Danny—that Danny should not plea bargain because he had not been involved in either of the bank burglaries for which he was charged—was clearly severable from other statements in which Dick inculpated himself in the burglaries. Dick's statement regarding Danny's innocence was not necessary to Dick's admission that he and Stephanie were involved in the crimes.

■ Because Dick's statement exculpating Danny is severable, it must itself be analyzed under the requirements of 804(b)(3). Unlike Dick's statement implicating himself in the burglaries, Dick's statement regarding Danny's innocence was clearly not against Dick's penal interest. "To be admissible under rule 804(b)(3), a statement against penal interest must so far tend to subject the declar-

ant to criminal liability 'that a reasonable man in his position would not have made the statement unless he believed it to be true.' " *United States v. Chalan*, 812 F.2d 1302, 1311 (10th Cir.1987) (quoting Fed.R. Evid. 804(b)(3)). Rather than tending to inculpate Dick, this statement merely tended to exculpate Danny.

Finally, there is the need for corroborating circumstances that clearly indicate the trustworthiness of Dick's statement exculpating Danny. The determination of the sufficiency of such corroborating evidence "lies within the sound discretion of the trial court, which is aptly situated to weigh the reliability of the circumstances surrounding the declaration." *United States v. Guillette*, 547 F.2d 743, 754 (2d Cir.1976). Given evidence of the close relationship between Dick and Danny, and a lack of evidence supporting Dick's statement that only he and Stephanie were involved in the burglaries,[5] the district court's apparent finding of insufficient corroboration is not without support in the record.

Considering the totality of the circumstances surrounding Dick's statements, we conclude that the district court did not abuse its discretion in excluding Trina's proffered testimony regarding Dick's statement exculpating Danny, while admitting her testimony regarding Dick's incrimina-

---

5. Porter did offer the testimony of three witnesses in an attempt to provide an alibi. The superintendent for the construction company at which Porter was employed at the time of the Farmers State Bank burglary testified that Porter rode to work every day with Calvin Gustus, Porter's cousin who lived in Geneseo, and that he did not know of Porter arriving at work by any other means. On cross-examination, however, the superintendent testified to a lack of personal knowledge as to how Porter got to work on the day of the burglary.

Similarly, Calvin Gustus, also known as "Mouse," testified that Porter rode to work with him every time that Porter worked at the Ellsworth prison job site. When asked about his memory, however, Gustus testified that it was "[n]ot real good." When asked about whether he remembered picking up Porter and taking him to work on the day of the burglary, Gustus merely restated that he was the only means for Danny to get a ride to work, and that he really didn't remember that day.

Finally, Paula Taylor, the woman with whom Porter lived from approximately December 30,

1986 to August 1, 1987, testified that every day that Porter went to work, Calvin Gustus picked him up at her house. She stated that she could not recall any day during the three-week period that Porter worked at the Ellsworth prison construction site that Porter did not go to work. According to payroll records, however, there were several days that Porter did not go to work during that period. When pressed about her actual memory of the day of the Farmers State Bank burglary, she admitted that she really did not remember the day in question.

This testimony, if believed, could provide a basis for contradicting Stephanie Porter's statement that she and Dick dropped Danny off at his construction job after the Farmers State Bank burglary, thereby showing that Danny was actually at home in Geneseo and not involved in the burglary. Given the inconclusive nature of this testimony, however, the district court could reasonably have found it insufficient to corroborate Dick's statement regarding Danny's innocence.

ting statement. Dick's incriminating statement satisfied the trustworthiness rationale of rule 804(b)(3), while his statement exculpating his brother Danny did not.

■ Further, even if the trial court erred in excluding this testimony, such error would be harmless. The same evidence that Danny Porter wished to admit through Trina Smith's testimony was presented to the jury through the testimony of Norman Murphy. Murphy testified that Dick told him Danny was innocent and that he saw Dick tell Trina that Danny was innocent. The defendant was therefore not unduly prejudiced by the exclusion of Trina's cumulative testimony.

### III.

Porter claims that the district court erred in admitting testimony regarding the attempted burglary of the Mayfield grocery store as evidence of other bad acts under rule 404(b) of the Federal Rules of Evidence.[6] Evidence of the Mayfield incident centered on the testimony of Deputy Sheriff Richard Goodrum, FBI Agent Andrew Bingaman, and Stephanie Porter.

Deputy Sheriff Goodrum made an in-court identification of Danny Porter as one of the individuals he observed fleeing the Mayfield grocery store. He also testified about the discovery of Dick Porter's Silverado pickup truck parked off the road near the scene of the crime, and the officer's search of that truck which produced the wallets containing Dick and Danny Porter's driver's licenses.

Agent Bingaman testified that he was called by the Sumner County Sheriff's Office and told that they had found a pickup truck which contained some articles they thought might be related to the FBI's bank burglary investigations. Bingaman went on to testify about the items collected from the truck, which included the following: the wallets containing Dick and Danny Porter's driver's licenses, a police scanner,

a scanner book identifying the radio channels used by law enforcement officers in various locales, a map from a newspaper article regarding recent bank burglaries in Kansas, a revolver, and, in the wallet belonging to Dick Porter, a silver certificate one-dollar bill having a serial number that matched a number on the list of bait bills from the Farmers State Bank.

Stephanie Porter testified to a conversation between herself, Dick, and Danny regarding the Porter brothers' flight from the police, the brothers' observation of the police officers' discovery and search of their Silverado pickup truck, and the contents left in the truck. Stephanie also testified to a story that the Porter brothers fabricated and planned to tell the police, if they were caught, to explain the presence of Dick's truck near the scene of the crime.

Porter contends that testimony regarding the attempted burglary of the Mayfield grocery store was erroneously admitted for two reasons. First, he claims that the court failed to specifically articulate the grounds for admitting this evidence of other bad acts, as required in this circuit. *See United States v. Kendall*, 766 F.2d 1426, 1437 (10th Cir.1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986). Second, presuming that such evidence was admitted for a proper purpose, he contends that the unfair prejudicial impact outweighs the probative value of that evidence because the attempted burglary in Mayfield lacked sufficient similarity to the bank burglaries.

■ To help ensure that evidence of other bad acts is not used for the impermissible purpose of "prov[ing] the character of a person in order to show action in conformity therewith," Fed.R.Evid. 404(b), this circuit requires the Government to "articulate precisely the evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts." *United States v. Kendall*, 766 F.2d 1426,

**6.** Rule 404(b) provides:

**Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.

It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Fed.R.Evid. 404(b).

1436 (10th Cir.1985), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986). "In addition, the trial court must specifically identify the purpose for which such evidence is offered and a broad statement merely invoking or restating Rule 404(b) will not suffice." *Id.*

These requirements serve important purposes in protecting the accused from unfair prejudice and preserving a means to review the district court's decision:

A specific articulation of the relevant purpose and specific inferences to be drawn from each proffer of evidence of other acts will enable the trial court to more accurately make an informed decision and weigh the probative value of such evidence against the risks of prejudice specified in Rule 403. This requirement is an attempt to ensure that a decision to admit or exclude be made only after issues and reasons are exposed and clearly stated. In addition, specific and clear reasoning and findings in the trial record will greatly aid an appellate court in its review of these evidentiary issues.

*Id.* at 1436–37 (citation omitted); *see also United States v. Orr,* 864 F.2d 1505, 1511 (10th Cir.1988) (reiterating importance of adherence to *Kendall* requirements). Nevertheless, the *Kendall* requirements are not indispensable. This court has recently held that "any error in failing to adhere to the *Kendall* requirements would be considered harmless if 'the purpose for admitting the other acts testimony is apparent from the record, and the district court's decision to admit was correct.'" *United States v. Record,* 873 F.2d 1363, 1375 n. 7 (10th Cir.1989) (quoting *United States v. Orr,* 864 F.2d 1505, 1511 (10th Cir.1988)). As the Supreme Court noted recently: "Congress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was with ensuring that restrictions would not be placed on the admission of such evidence." *United States v. Huddleston,* 485 U.S. 681, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988).

Although adherence to the *Kendall* requirements provides protection from unfair prejudice, such protection also emanates from these four requirements of the Federal Rules of Evidence:

[F]irst, from the requirement of Rule 404(b) that the evidence be offered for a proper purpose; second, from the relevancy requirement of Rule 402—as enforced through Rule 104(b); third, from the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice; and fourth, from Federal Rule of Evidence 105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

*Id.,* 108 S.Ct. at 1502 (footnote and citations omitted). "Thus, if the transcript reflects that the 'decision to admit' was proper under the requirements of *Huddleston,* any failure to adhere to *Kendall* will necessarily be harmless." *Record,* 873 F.2d at 1375 n. 7 (quoting *United States v. Orr,* 864 F.2d 1505, 1511 (10th Cir.1988)).

Here, Porter is correct that at the time the trial court admitted evidence of the Mayfield incident, the court failed to specifically articulate its basis for admitting such evidence.[7] Our examination of the record indicates, however, that the Government had previously discussed its theory for admitting this evidence. In a preliminary hearing, the Government specifically informed the court of its intention to introduce evidence regarding the attempted burglary in Mayfield for the purpose of establishing the identity of Porter. During the trial, the Government again stated its general purpose for all the prior bad acts evidence they intended to proffer throughout the trial—that is, they sought to use evidence of similar burglaries to establish the identity of the defendant through the *modus operandi* common to all of the crimes. The court and the defense were therefore

---

**7.** At trial the defendant objected to testimony regarding the Mayfield incident as impermissible evidence of other bad acts. The trial court overruled the objection without comment, but later gave a limiting instruction regarding the use of other bad acts evidence.

aware of the purpose for which this evidence was offered.

Furthermore, after the Government's initial proffer of other bad acts evidence, the court informed the parties that it would scrutinize such evidence during the course of the trial. In ruling on the admissibility of such evidence, the court noted that it would make the following determinations: First, whether the Government made a clear showing that opportunity, plan, and identity are relevant and can be shown by the use of the proffered prior bad acts; and second, whether the probative value of the 404(b) evidence is outweighed by its potentially prejudicial effect. The court then informed the defense that no continuing objection would be allowed during the trial.

The district court was therefore aware of the appropriate factors to be considered in admitting evidence of other bad acts. On the basis of the record established at trial, we find that the district court's decision to admit testimony regarding the Mayfield incident satisfies the four requirements articulated in *Huddleston*, rendering harmless any error in failing to follow the *Kendall* requirements.

 First, the evidence was offered for the proper purpose of establishing Porter's identity as the perpetrator of the bank burglaries through showing a common method of committing such crimes. Further, although not specifically offered for this reason, the testimony of Agent Bingaman and Deputy Sheriff Goodrum also served the proper purpose of corroborating Stephanie Porter's testimony.[8]

Second, such evidence was relevant to resolving issues in controversy. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Fed.R.Evid. 401. Showing that Danny was involved in the Mayfield burglary attempt, and that this incident shared a common *modus operandi* with the bank burglaries, makes his involvement in the bank burglaries more probable.

Because Stephanie Porter's credibility had been placed in issue by the defense, the corroborating testimony about the Mayfield incident is also relevant for the purpose of overcoming that attack. Deputy Sheriff Goodrum's account of his pursuit of the Porter brothers and the subsequent discovery of Dick Porter's Silverado pickup is consistent with Stephanie's testimony relating Danny and Dick's story about the incident. In addition, Stephanie had previously testified that she was present when a police scanner was used in connection with the Farmers State Bank burglary. Agent Bingaman's testimony concerning the items found in Dick's truck, which Danny apparently occupied prior to the Mayfield burglary attempt, corroborates Stephanie's testimony regarding the Farmers State Bank burglary to the extent that the scanner and scanner book used in that burglary were identified and shown to exist. Further, the map found in the pickup truck contained marks that Stephanie testified to making in Dick's presence to indicate which of the bank burglaries shown there had not been committed by the Porter brothers. The existence of the map therefore corroborates Stephanie's testimony regarding Dick's admission that he and Danny had committed the Farmers State Bank burglary. Stephanie's accuracy and veracity in relating the Porter brothers' account of the Mayfield incident, and the corroborating evidence of the items found in the truck, make more likely the possibility that she accurately and truthfully testified to Danny's involvement in the bank burglaries—which was of critical importance to the Government's case.

---

**8.** Although corroboration is not among the purposes expressly listed in rule 404(b), the text of rule 404(b) indicates that the purposes listed therein are not intended to be exhaustive, but are merely examples of the kinds of proper purposes for which evidence of extrinsic acts can be used. *See* Fed.R.Evid. 404(b). The rule states that extrinsic evidence "may ... be admissible for other purposes, *such as* proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* (emphasis added); *see also McCormick on Evidence* § 190, at 558 nn. 9, 10 (E. Cleary 3d ed. 1984).

Although this evidence in no way conclusively establishes Porter's guilt in the bank burglaries, it is sufficiently probative to satisfy the relevancy requirement. As aptly stated by McCormick:

> An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. It need not even make that proposition appear more probable th[a]n not.... It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence.... A brick is not a wall.

*McCormick on Evidence* § 185, at 542–43 (E. Cleary 3d ed. 1984) (footnotes omitted).

Third, the probative value of this evidence, although relevant, was not substantially outweighed by the potential for unfair prejudice. *See* Fed.R.Evid. 403. Although the district court did not make a specific finding regarding the probative value and the prejudicial effect of the evidence at the time of its ruling, the record indicates it was aware of the duty to make such a determination. Further, the court had previously allowed the parties to present arguments regarding this issue.

Porter argues that there is not sufficient similarity between the Farmers State Bank burglary and the attempted burglary of the Mayfield grocery store to link him to both crimes. This court has held, however, that evidence of another crime need not be identical to the crime charged, but need only be similar and share with it "elements that possess 'signature quality.'" *United States v. Gutierrez*, 696 F.2d 753, 755 (10th Cir.1982), *cert. denied*, 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 *and* 461 U.S. 910, 103 S.Ct. 1885, 76 L.Ed.2d 814 (1983). Here, both the offenses (burglary and attempted burglary) and the manner of their execution was similar. All of the offenses occurred in small rural Kansas communities in the early morning hours. Prior to breaking into the buildings, the perpetrators in each case cut the lines leading to the buildings' security systems. In the context of this case, we find these elements to be sufficiently similar to justify an inference that the same people perpetrated these burglaries.

Here, the evidence was probative of the identity of the accused, an issue of clear importance to this case in light of Porter's attempt to raise an alibi defense. Prejudice from such evidence was capable of being limited by the court's instructions to the jury restricting the use of such testimony. The prosecution's closing argument further emphasized that the jury was not to convict on the basis of Danny Porter's participation in the Mayfield burglary attempt. The fact that the jury acquitted Porter of one of the charged offenses provides an additional indication that the jury did not use evidence of Porter's involvement in the Mayfield burglary attempt as a proxy for a specific finding of guilt regarding the charged crimes. Although reasonable persons could differ as to the weight of the probative value of that evidence against its prejudicial effect, we cannot say in this case that the district court abused its discretion under rule 403 by admitting such evidence.

Finally, *Huddleston* requires that the trial court give limiting instructions to the jury concerning the proper purpose for which the evidence may be used, if such instructions are requested by the parties. The district court informed the defendant that it would receive a request for such instructions, and the court did in fact give an instruction at the close of the Government's presentation of its 404(b) evidence and again at the close of the trial.

We hold that the testimony regarding the Mayfield incident was properly admitted under the guidelines of *Huddleston*. Here, any failure to adhere to *Kendall*'s requirement of a precise articulation of the purpose for which the evidence was admitted is harmless error. *See Record*, 873 F.2d at 1375 n. 7.

## IV.

■ Porter alleges that the district court erred in giving the jury an *Allen* charge after they indicated that they might be unable to reach a verdict. *See Allen v. United States*, 164 U.S. 492, 501, 17 S.Ct.

154, 157, 41 L.Ed. 528 (1896).[9] In this circuit an *Allen* charge can be given if it is not impermissibly coercive. *See United States v. Blandin*, 784 F.2d 1048, 1050 (10th Cir.1986). In determining whether an *Allen* instruction is permissible, the Tenth Circuit "has made a case by case examination to determine whether the taint of coercion was present." *Munroe v. United States*, 424 F.2d 243, 246 (10th Cir.1970); *see United States v. McKinney*, 822 F.2d 946, 951 (10th Cir.1987). Some factors considered in making this determination include: (1) The language of the instruction;[10] (2) its incorporation with other instructions;[11] and (3) the timing of the instruction, for example, whether given before the jury has commenced delibera-

tions[12] and whether given before the jury has reached an impasse or deadlock.[13]

Here, a modified *Allen* instruction was included in the original charge to the jury. After several hours of deliberation, the jury foreman delivered a message to the court stating, "Your Honor—We the jury have not been able to reach a verdict. It appears that we may not be able to reach agreement. We seek advise [sic] or counsel at this time." The court, over objection, read to the jury an additional *Allen* instruction.[14] The court then asked the jury whether they thought they could reach a verdict if given more time. After affirmative responses from the jurors, the court ordered the jury to retire for the evening and to recommence deliberations in the

9. An *Allen* charge derives its name from jury instructions approved by the Supreme Court in *Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 157–58, 41 L.Ed. 528 (1896). The Court described those instructions as follows:

These instructions were quite lengthy, and were, in substance, that in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority. *Id.* at 501, 175 S.Ct. at 157.

10. *See, e.g., United States v. Smith*, 857 F.2d 682, 684–85 (10th Cir.1988); *United States v. Brunetti*, 615 F.2d 899, 903 (10th Cir.1980); *Munroe v. United States*, 424 F.2d 243, 246 & n. 5 (10th Cir.1970); *United States v. Winn*, 411 F.2d 415, 416–17 (10th Cir.), *cert. denied*, 396 U.S. 919, 90 S.Ct. 245, 24 L.Ed.2d 198 (1969).

11. *See, e.g., United States v. McKinney*, 822 F.2d 946, 950–51 (10th Cir.1987); *United States v. Blandin*, 784 F.2d 1048, 1050 (10th Cir.1986); *Munroe*, 424 F.2d at 246; *United States v. Wynn*, 415 F.2d 135, 137 (10th Cir.1969), *cert. denied*, 397 U.S. 994, 90 S.Ct. 1133, 25 L.Ed.2d 402 (1970); *Winn*, 411 F.2d at 417.

12. *See, e.g., McKinney*, 822 F.2d at 950–51; *Blandin*, 784 F.2d at 1050; *Munroe*, 424 F.2d at 246 & n. 6.

13. *See, e.g., Smith*, 857 F.2d at 684; *Munroe*, 424 F.2d at 247; *Winn*, 411 F.2d at 416.

14. The court instructed the jury as follows:

In light of the importance of this case and in light of the fact that it has been a trial of some moderate length and magnitude, your failure to agree on a verdict will necessitate another trial. I'm of the opinion that this case cannot be tried better or more exhaustively than it has been on either side. It is therefore very desirable that you should agree on a verdict. I do not desire that any juror should surrender his or her conscientiously held convictions; on the other hand, each juror should perform his or her duty conscientiously and honestly, according to the law and the evidence, and although the verdict to which a juror agrees must, of course, be his or her own verdict, the result of his or her own convictions and not mere—not a mere acquiescence in the conclusions of his or her fellows, yet in order to bring 12 minds to a unanimous result, you must examine the questions submitted to you with candor and with a proper regard and deference to the opinion of each other. You should consider that the case must at some time be decided; that you are selected in the same manner and from the same source from which any future jury must be and there is no reason to suppose that the case will be submitted to 12 men and women more intelligent, impartial or competent to decide it or that more or clearer evidence will be produced on one side or the other. You may conduct your deliberations as you choose, but I suggest that you carefully consider the evidence in this case.

morning. The jury reconvened the next day, and later that morning returned its verdict finding Porter guilty of Count I of the indictment and not guilty of Count II.

Porter alleges that the language in the *Allen* instruction, coupled with the fact that it was given during the course of deliberations, resulted in improper coercion of the jurors. We disagree.

■ With regard to the language, Porter contends that because the district court judge instructed the jury in the first person, the judge improperly interjected his personal views into the language of the instruction. We must keep in mind that "the inquiry in each case is whether the language used by the judge can be said to be coercive, or merely the proper exercise of his common law right and duty to guide and assist the jury toward a fair and impartial verdict." *United States v. Winn,* 411 F.2d 415, 416 (10th Cir.), *cert. denied,* 396 U.S. 919, 90 S.Ct. 245, 24 L.Ed.2d 198 (1969). Here, although the judge did state his opinion that the case could not have been "tried better or more exhaustively than it has been on either side," the remainder of the instruction properly and clearly emphasized that no "juror should surrender his or her conscientiously held convictions," and that each juror, whether in the majority or the minority, should consider his or her position on the evidence with proper deference to the opinions of the others. The fact that this charge was not directed specifically at jurors holding the minority view further reduces the possibility of coercion. *See Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 551, 98 L.Ed.2d 568 (1988). We hold that the language in this instruction was not unduly coercive, but was a proper exercise of the judge's duty to guide the jury.

■ Porter further argues that the repetition of an *Allen* instruction during the course of jury deliberations unduly emphasized the importance of reaching a verdict, thus creating a coercive context for the jury deliberations. "The use of a supplemental [*Allen*] charge has long been sanctioned." *Lowenfield,* 108 S.Ct. at 550. This court has previously emphasized that

there is no per se rule against giving an *Allen* charge after a jury has commenced deliberations. *McKinney,* 822 F.2d at 951. Although the preferred practice is to give an *Allen* charge only prior to commencing any deliberations, *see id.,* this circuit has previously found that *Allen* charges given during the course of deliberations were not unduly coercive. *See, e.g., id.* at 950–51 (upholding instruction when jury reported agreement on three of thirty-one counts but could not agree on remaining counts); *Munroe,* 424 F.2d at 247 (upholding instruction when jury called in on court's initiative); *Wynn,* 415 F.2d at 136–37 (upholding instruction when jury called in because jury reported that they were "unable to agree").

Considering the overall context of the *Allen* charge given here, we conclude that it was not impermissibly coercive in a way that undermined the integrity of the deliberation process. Although the jury here requested advice from the court because it was unable to agree, the jurors' affirmative responses to the judge's query regarding whether they would be able to reach a verdict if given more time indicates that they were not hopelessly deadlocked. The judge further alleviated any sense of coercion by excusing the jury until the following morning. We hold that the district court did not err in its instruction of the jury.

## V.

■ Porter contends that there is insufficient evidence to support the jury's verdict of conviction with regard to the Farmers State Bank burglary.

In reviewing a criminal conviction, we examine the evidence in the light most favorable to the Government in order to determine whether the evidence, both direct and circumstantial, together with all reasonable inferences to be drawn therefrom, is substantial enough to establish guilt beyond a reasonable doubt. All reasonable inferences and credibility choices must be made in support of the jury's verdict.

*Blandin,* 784 F.2d at 1050 (citations omitted).

Here, Stephanie Porter testified to her first-hand knowledge of Danny Porter's involvement in the Farmers State Bank burglary. She also testified to statements Dick made to her about Danny's participation in the bank burglaries and in the attempted burglary in Mayfield. Corroborating evidence supported Stephanie Porter's testimony, and additional evidence of other bad acts committed by Danny helped establish his identity as the perpetrator of the crime charged. In light of the standard of review, we find sufficient evidence in the record to support the jury's verdict.

## VI.

We find no abuse of discretion in the trial court's refusal to admit certain hearsay testimony or in its admission of other bad acts evidence. We hold that the trial court did not err in its instruction of the jury. We find sufficient evidence to support the jury verdict. AFFIRMED.