7 F.3d 1045
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
John Russell BIZZELL and Charles Kent Bizzell,
Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles Kent BIZZELL, Defendant-Appellant.
 Nos. 92-6008, 92-6166.
 United States Court of Appeals, Tenth Circuit.
 Aug. 17, 1993.
 
 Before EBEL, GODBOLD,* and KELLY, Circuit Judges.
 ORDER AND JUDGMENT**
 EBEL, Circuit Judge.
 
 
 1
 The defendants-appellants, Charles Kent Bizzell ["Kent"] and John Bizzell ["John"], were convicted for violations of 18 U.S.C. § 1010, which prohibits the making of false statements to the Department of Housing and Urban Development ["HUD"]. Their convictions arose from an alleged scheme to help Hiram Stanley Sasser, II ["Sasser"] obtain HUD-insured loans without meeting certain HUD requirements. They allege several errors on appeal, including the insufficiency of the evidence, the impropriety of the district judge's comments at trial, the failure to excuse a juror for cause, the failure to exclude evidence in violation of the Confrontation Clause, and the amount of the district court's order of restitution against Kent. We affirm except that we remand for a determination whether the court's order of the loss attributable to Kent was attached to the presentence report as required by Rule 32(c)(3)(D).
 
 FACTS
 
 2
 HUD administers the Federal Housing Administration's ["FHA"] single-family home-mortgage insurance program. I R. 183. When HUD insures a mortgage, it essentially promises the lender that HUD will pay the unpaid balance of the loan in the event of default. I R. 31-32, 39. Under the FHA program, HUD will insure a mortgage on a home purchased as an investment--such as a rental property--for up to eighty-five percent of the cost of acquiring it.[1] The borrower is required to make a down payment or "equity investment"; that is, the buyer must pay the remaining fifteen percent from his or her own funds. I R. 44-45. The seller may not pay the buyer's downpayment. See I.R. 44. At issue here is whether the sellers, Kent and John, paid the buyer's downpayments and then misrepresented that fact in forms submitted to HUD.
 
 
 3
 HUD-insured loans offer borrowers the advantage of unrestricted assumability and lower interest rates than would otherwise be available. I R. 39. That is, although the original buyer must qualify for the HUD-insured loan, subsequent buyers of the property may assume the loan without meeting creditworthiness requirements. I.R. 39-40. The defendants' expert witness stated that property is easier to sell when it has a HUD-insured mortgage because the field of potential buyers is expanded to include those who could not ordinarily qualify for a mortgage because they are not creditworthy. III R. 402.
 
 
 4
 During the mid-eighties, when the real estate transactions at issue in this case took place, the Oklahoma City real estate market was depressed. I R. 14. Kent was a realtor and the sole owner of Bizzell Realty in Midwest City. Both Kent and John built houses in the Midwest City area. III R. 349, 350. Some of the houses that Kent and John built remained unsold in the depressed market, although Kent and John still carried hefty loans on the properties. I R. 67-68. In early 1986, Sasser, a loan officer at Talman Home Mortgage Corporation ["Talman"], arranged to buy two single-family homes from Kent and five from John, which they had built and on which they still carried notes. See I.R. 67-68; Aple.Br. 5. The purchases were to be financed through Talman with HUD-insured loans. I R. 26-28. John and Kent were convicted based upon misrepresentations they allegedly made in settlement statements submitted to HUD in connection with Sasser's attempt to obtain HUD insurance.[2] The settlement statements, which were supposed to record the settlement of accounts that occurred at the closing of the sales, were signed by Sasser and the Bizzells and indicated that Sasser had paid fifteen percent of the purchase price and acquisition costs of each of the seven properties from his own funds, with the other eighty-five percent coming from HUD-insured mortgages. I R. 35, 53-54, 68.[3] But evidence introduced at trial suggested that the Bizzells had illegally paid Sasser's downpayment. The Bizzells paid for the cashier's checks that were brought to the closing and that were ultimately used to pay Sasser's downpayment and closing costs. VI R. 329-39; I R. 65-66; II R. 176; II R. 214.
 
 
 5
 Kent and John eventually admitted to a HUD auditor investigating the transactions that they had, in fact, paid Sasser's earnest money deposit and other acquisition costs. III R. 314. However, the Bizzells contended that their verification was not false, as they had arranged with Sasser to pay him real estate commissions in the amount of his downpayments and settlement costs. III R. 314. They had therefore given the cashiers checks to Sasser in payment of a real estate commission for the sale of the properties, and Sasser had then signed the checks back over to the Bizzells for the downpayment and closing costs for the properties. II R. 230-31. Yet none of the documents submitted to HUD indicated that a real estate commission had been paid to Sasser, even though Sasser listed other settlement charges on the settlement statement and even though there was a space on the settlement form that expressly provided for the recording of commissions.[4] I R. 59, 60-61, 72; II R. 174, 234-35, 280. K.B. Br. Tab H Ex. II at 2; 280 at 2; II R. 230, III R. 180. Nor was the existence of the alleged trade-out agreement revealed to HUD auditors until some time into HUD's investigation. III R. 304-13.
 
 
 6
 As a result of the seven transactions between the Bizzells and Sasser, $369,888 in HUD-insured loans were created, and the Bizzells were relieved of $343,684 in debt that they were carrying on the unsold houses that they had built.[5] I R. 67-68.
 
 
 7
 In February 1987, HUD began auditing Talman and the HUD-insured loans it had originated. III R. 300. HUD auditor Sharon Shackelford Howell interviewed Kent several times concerning his sale of properties to Sasser. During the first three conversations she had with Kent, Howell testified that he did not tell her that he had credited Sasser with a real estate commission; in fact, in the third conversation he told her that he had never paid Sasser any real estate fees. III R. 309-11. Both Kent and John told her that Sasser had not paid any earnest money deposits. III R. 311, 312. Kent and John later told her that, in fact, Sasser had acted as a licensed broker and that in return, John and Kent paid the earnest money deposit shown on the sale contracts and the buyer's costs due at closing as shown on the settlement statement. HUD determined that if the payments were real estate commissions, they would be about seventeen percent. III R. 313.
 
 
 8
 On February 22, 1990, a grand jury in the Western District of Oklahoma charged Kent, John, and Sasser with conspiracy to defraud the United States in violation of 18 U.S.C. 271, K.B. Br. Tab A, (Count 1); charged Sasser and Kent with two counts of making false statements to HUD on their settlement statements in violation of 18 U.S.C. § 1010, K.B. Br. Tab A, (Counts 10, 11); charged Sasser and John with five counts of making false statements on their settlement statements in violation of § 1010, K.B. Br. Tab A, (Counts 12-16); and charged Kent and John with two counts each of making false statements to a HUD auditor in violation of 18 U.S.C. § 1001, K.B. Br. Tab A, (Counts 17-20).[6]
 
 
 9
 After the first jury trial, the district court granted the Bizzells a mistrial because the jury was unable to come to a verdict as to them, although Sasser was convicted of various offenses. After the second jury trial, Kent was found guilty on two counts of making false statements to HUD in violation of § 1010, and John was found guilty on five counts of the same offense. K.B. Br. Tab B; J.B. Br. Tab B. A mistrial was again declared on the conspiracy count against Kent and John because the jury was unable to reach a verdict on that count. K.B. Br. Tab B; J.B. Br. Tab B. The district court sentenced Kent on December 20, 1991, to concurrent eighteen-month terms of imprisonment on each count of conviction, ordered him to perform 200 hours of community service, and ordered him to pay restitution for that part of the victim's total loss that would later be determined to be attributable to him. K.B. Br. Tab B. On the same day, the court sentenced John to concurrent terms of one year and one day's imprisonment on each of his five counts of conviction, ordered him to perform 200 hours of community service, and ordered him to pay restitution for that portion of Talman's loss attributable to him as later determined. J.B. Br. Tab B. On April 21, 1992, the district court ordered Kent to pay $57,147.59 in restitution. K.B. Br. Tab C.
 
 DISCUSSION
 
 10
 On appeal, Kent and John assert that (1) there was insufficient evidence to support their convictions, (2) the district court erred in refusing to excuse a juror for cause, (3) the district court violated their right to confrontation by admitting evidence of statements made by Sasser, and (4) the district court erred in submitting a supplemental Allen instruction to the jury after it announced that it was deadlocked. In addition, Kent contends that the district court erred in making prejudicial comments to him in front of the jury and in ordering him to pay $57,147.59 in restitution. We will address each contention in turn.
 
 I. SUFFICIENCY OF THE EVIDENCE
 
 11
 Kent and John first contend that there is insufficient evidence to support their convictions under 18 U.S.C. § 1010.[7] To prove a § 1010 offense, the government must establish (1) the making of a false statement in the application (2) with the knowledge it was false (3) for the purpose of obtaining a loan from the lending institution or influencing HUD. See United States v. Lovett, 844 F.2d 487, 489 (7th Cir.1988) (citing United States v. Leach, 427 F.2d 1107, 1111 (1st Cir.), cert. denied, 400 U.S. 829 (1970)).[8] The evidence is sufficient to support a conviction if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Ratchford, 942 F.2d 702, 703 (10th Cir.1991), cert. denied, 112 S.Ct. 1185 (1992).
 
 
 12
 We find that there was sufficient evidence from which the jury could find the existence of each element of § 1010 as to John and Kent. First, the jury was entitled to find that the defendants made false statements on the settlement statements. The settlement forms expressly state that the earnest money deposit, settlement costs, and downpayment are "amounts paid by or in behalf of borrower" and "cash ... from ... borrower." See, e.g., K.B. Br. Tab H Ex. 11. Although the settlement statement does not expressly state that the buyer made the payments from his own funds, we have held that such a statement may be implied from HUD regulations that require the buyer to pay the earnest money and downpayment from his own funds. United States v. Sasser, 971 F.2d 470, 476 (10th Cir.1992) ("A false statement ... can be implied by 'use of a document [that] makes the factual assertions necessarily implied from the statutes, regulations, and announced policies that created the document.' ") (quoting United States v. Waechter, 771 F.2d 974, 979 (6th Cir.1985)), cert. denied, 113 S.Ct. 1292 (1993). The jury was entitled to disbelieve the Bizzells' claims that the cashier's checks brought to the closing were actually real estate commissions paid to Sasser and to conclude from the evidence that the Bizzells in fact were paying Sasser's downpayment and other acquisition costs. The commissions were not disclosed on any of the documents submitted to HUD and, indeed, were not disclosed to HUD auditors until some time into the investigation. The commissions were unusually high for the area--nearly seventeen percent rather than the typical six to seven percent--even though Sasser, as the buyer and broker, performed only two of the duties typically performed by listing and selling agents: he found a buyer (himself) and filled out his own loan application.[9] II R. 266-67; 314; 353; III R. 397, 411-412. Moreover, Sasser never told Omar Dennis, the branch manager at Talman, that he was acting as a realtor on the property purchases. III R. 175. Dennis testified that to his knowledge, Sasser never engaged in real estate brokerage work while at Talman, and that Talman did not allow loan officers to engage in brokering work or to receive real estate commissions. III R. 180. Last, a letter agreement signed by Sasser and Kent indicated that the sale price on the two properties for depreciation purposes was to be $48,993--an amount equal to about eighty-five percent of the sales price as shown in the sales contract for the property and the same amount as the HUD-insured loan. See I.R. 64; II R. 125-26; 232. However, the letter was never submitted to HUD, Talman, or the title company. I.R. 126; II R. 547. The letter suggests that the actual sale price was 100 percent of the HUD-insured loan, which is illegal under HUD regulations. II R. 178-79. The jury therefore could conclude that John and Kent paid Sasser's downpayment and costs, and then represented to the contrary on the settlement forms.
 
 
 13
 Second, the jury was entitled to find that the defendants knew that their statements were false. Kent and John knew the application forms they signed represented that deposits had been received from the borrower and as pointed out above, the jury could have found that this representation was false. Kent and John contend that any false statements they made were made inadvertently in reliance on Sasser's representations that the transactions were legal. However, the issue here is whether Kent and John knew the statements were false--not whether they knew the statements were illegal. In any event, the evidence showed that Kent and John were familiar with HUD insurance requirements. II R. 146, 169; IV R 537-39. For example, Kent had previously been involved with HUD-insured loans, both as a buyer-borrower and as a seller. III R. 168-69; IV R. 537-39. The jury could infer from this and other evidence that Kent and John were aware of HUD regulations requiring the buyer to pay the downpayment and other acquisition costs from his own funds, and that they knowingly signed settlement statements that falsely represented that Sasser had done so.[10]
 
 
 14
 Third, the jury could infer that the defendants made the false statements for the purpose of influencing HUD. The evidence suggested that the defendants engaged in an elaborate scheme with Sasser to place HUD-insured mortgages on properties that the defendants had been unable to sell, in order to increase their chances of being sold in a down market. Larry Mumford, a HUD supervisor in the single-family home mortgage insurance program, testified that had HUD known that Kent and John were paying Sasser's downpayment and other acquisition costs, it never would have approved the issuance of insurance for the loans. Indeed, it would have been illegal for HUD to have approved such loans. I R. 41, 50, 70, 72. The jury could have inferred that Kent and John signed the settlement statements verifying their accuracy in an attempt to influence HUD to accept Sasser's application for loan insurance.[11] We therefore hold that the evidence was sufficient to support the defendants' convictions under § 1010.
 
 II. REFUSAL TO EXCUSE JUROR FOR CAUSE
 
 15
 Both Kent and John contend that the district court erred in refusing to dismiss a juror for cause. The juror, Lisa Edmunds, volunteered during voir dire that she had "recently bought a HUD home." Aplt.App. 3. When asked whether anything would cause her to favor or disfavor HUD as a result of the transaction, she answered in the negative. Id. The defendants, however, theorized that "due to the fact that she was insured by HUD, that makes her have a personal stake because she's a shareholder in a corporation." Id. at 4-5. The defendants cited Mumford's testimony from the defendants' first trial, which indicated that HUD borrowers pay a mortgage insurance premium of approximately $1500 to $2000 into a HUD insurance fund. According to Mumford, the fund is "used to pay claims, and any money remaining in the fund at the time a loan is amortized, may be ... repaid to the participants who stay in the program and keep their loans current." He termed the payments a "distributive share." K.B. Br. Tab F.
 
 
 16
 We review the district court's decisions concerning the seating or excusing of jurors only for an abuse of discretion. United States v. Bedonie, 913 F.2d 782, 795 (10th Cir.1990) (citation omitted), cert. denied, 111 S.Ct. 2895 (1991). A court must grant a challenge for cause if, by express admission or proof of specific facts, actual prejudice or bias is shown. Id. (citing United States v. Nell, 526 F.2d 1223, 1229 (5th Cir.1976)). Here, however, the defendants made no showing that Juror Edmunds was actually biased; rather, they would have us infer bias from Juror Edmunds' ownership of a HUD home. We decline to do so.
 
 
 17
 As an initial matter, we note that the Supreme Court and this Circuit have not looked favorably upon attempts to impute bias to jurors. See, e.g., Smith v. Phillips, 455 U.S. 209, 214-217 (1982) (rejecting argument that the court should impute bias to juror who applied for job at prosecutor's office during trial, and stating that "[t]his court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias") (and cases cited therein); United States v. Bradshaw, 787 F.2d 1385, 1390 (10th Cir.1986); United States v. Jones, 707 F.2d 1169, 1173-74 (10th Cir.), cert. denied, 464 U.S. 859 (1983). But see Smith, 455 U.S. at 221 (O'Connor, J., concurring) (stating that the majority opinion does not foreclose the use of implied bias in "some extreme situations").
 
 
 18
 However, some Supreme Court cases suggest that bias should be implied if a juror has a sufficiently strong monetary interest. The Court has held in judge-bias cases that " 'it certainly violates the Fourteenth Amendment, and deprives a defendant in a criminal case of due process of law, to subject his liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case.' " Ward v. Monroeville, 409 U.S. 57, 60 (1972) (quoting Tumey v. Ohio, 273 F.2d 510, 523 (1927)). Although we find this rule to be equally applicable to jurors, we cannot say that Juror Edmund's pecuniary interest in the outcome of the case was so direct or substantial as to render her biased such that a new trial is required.
 
 
 19
 Title 12, Section 1711 apparently authorizes the issuance of a distributive share to previous HUD buyers based upon surplus funds that may ultimately remain in the aggregate HUD insurance premium account.[12] A mortgagor is eligible to receive a distributive share only upon repayment of the mortgage. § 1711(c). Section 1711(e) appears to link a particular mortgagor's right to receive a distributive share to the health of the entire fund; thus, any claims paid by the fund as a result of the defendants' activities would reduce the size of the fund and therefore could conceivably reduce Juror Edmunds' chances of receiving a distributive share. However, we are at a loss to see how a criminal conviction of the defendants would materially affect Juror Edmunds' distributive share. Whether the mortgagors involved in this case defaulted on HUD-insured loans is a different question than whether the defendants were criminally involved in facilitating the acquisition of HUD-financed loans through illicit means. That is, the defendants offer us no arguments, authority, or evidence suggesting that a conviction (or for that matter an acquittal) of criminal charges against these defendants would affect the size of the fund.
 
 
 20
 Although an order of restitution in favor of HUD or HUD's preclusive use of the criminal convictions to obtain a civil judgment conceivably could increase the size of the premium fund, we find any pecuniary interest that Juror Edmunds might have as a result to be too indirect and insubstantial to support a finding of implied bias.[13] The defendants offered no proof as to whether (a) Juror Edmunds was entitled to the distributive share because she, and not some previous mortgagor, was entitled to the payment,[14] (b) the premium fund is sufficiently solvent such that there is a reasonable possibility that she could receive a distributive share when her mortgage is paid off; and (c) she had any idea that she might be entitled to a distributive share.
 
 
 21
 Given the uncertain, contingent, and indirect nature of any pecuniary interest that Juror Edmunds might have had, we hold that the defendants' due process rights were not violated by her presence on the jury. Cf. Aetna Life Ins. v. Lavoie, 475 U.S. 813, 826 (1986) (holding that although state court justices might have had a slight pecuniary interest in a case similar to the one before the court, their interest was not so direct, personal, and substantial that due process required their disqualification, where nothing in the record suggested that the justices were aware of the class action, no relief had been awarded in the class action, and any interest they had was "highly speculative and contingent"). "Whether [the juror] had any preconceived [prejudice] against defendant is a matter of supposition." United States v. Jones, 707 F.2d 1169, 1173 (10th Cir.1983) (citation omitted). Consequently, we decline to hold that the district court abused its discretion in refusing to dismiss Juror Edmunds for cause.[15]
 
 III. ADMISSION OF COCONSPIRATOR STATEMENTS
 
 22
 Kent and John contend that certain exhibits and testimony containing hearsay statements of their alleged coconspirator, Stan Sasser, were admitted in violation of the Sixth Amendment Confrontation Clause. Because evidence that is properly admitted under the coconspirator exception to the hearsay rule, Federal Rule of Evidence 801(d)(2)(E), does not violate the Confrontation Clause, see Bourjaily v. United States, 483 U.S. 171, 182-84 (1987), we will first examine this evidence to determine whether it was properly admitted under Rule 801(d)(2).
 
 
 23
 We review the district court's decision to admit hearsay evidence under the coconspirator rule for an abuse of discretion. Wolf, 839 F.2d at 1393. For coconspirator statements to be admissible under Rule 801(d)(2)(E), the district court must make a factual determination that the government has established, by a preponderance of the evidence, that (1) a conspiracy existed; (2) the defendant against whom the declaration is offered was a member of the conspiracy; and (3) the statement was made in the course of and in furtherance of the conspiracy. United States v. Wolf, 839 F.2d 1387, 1392 (10th Cir.), cert. denied, 488 U.S. 923 (1988); see Bourjaily, 483 U.S. at 175. Both Kent and John assert that the government failed to establish these elements by a preponderance of the evidence, particularly the "in furtherance of" prong.[16] They assert that some government exhibits and testimony contained statements by Sasser that were inadmissible under the coconspirator exception because they were made after the closing of the seven sales: January 1986 for Kent's properties and February 1986, for John's.[17] K.B. Br. Tab H, Ex. 11, 28 (Kent); I R. 63 (John). We disagree.
 
 
 24
 Statements by coconspirators are admissible under the coconspirator exception if they are intended to promote the conspiratorial objectives. Wolf, 839 F.2d at 1393 (citations omitted). Statements made to conceal the crime after the main conspiracy has ended fall beyond the purview of the coconspirator exception. Id. However, concealment of a crime done in furtherance of the main criminal objective will fall within the coconspirator exception: the Supreme Court has noted that concealment furthers the main criminal objective where "the successful accomplishment of the crime necessitates concealment." Grunewald v. United States, 353 U.S. 391, 405 (1957); Wolf, 839 F.2d at 1393. As an example, the Court opined that "[k]idnapers in hiding, waiting for ransom, commit acts of concealment in furtherance of the objectives of the conspiracy itself, just as repainting a stolen car would be in furtherance of a conspiracy to steal." Grunewald, 353 U.S. at 405.
 
 
 25
 The record supports a finding of a conspiracy, the goal of which was to obtain HUD financing in order to be able to sell houses that Kent and John were having difficulty selling. Under this theory, the conspiracy would not end until Sasser sold the last of the houses involved in the conspiracy--July 22, 1987. III R. 346. Under this theory, there are only two exhibits that were admitted that post-dated the conspiracy: (1) Gov't Ex. 164e, which was a copy of a statement that Kent sent to HUD on August 3, 1987; however this copy of the statement was sent to HUD by Sasser, and the government evidently offered to show that Kent sent Sasser a copy of it, V R. 645p, III R. 315; and (2) Gov't Ex. 165, which was a letter to a HUD auditor from Sasser dated August 26, 1987 to the effect that Sasser acted as listing and selling realtor in the sale of the seven properties, K.B. Tab H.
 
 
 26
 In any event, we conclude that any of the evidence that was erroneously admitted was harmless beyond a reasonable doubt. See Wolf, 839 F.2d at 1395. Exhibit 165 seems to shore up the defendant's theory that Sasser was acting as a real estate broker. Moreover, in Exhibits 164e, the Kent was the declarant. This could be considered an admission. Also, there is no reversible error where the declarant testifies in court and is subject to cross-examination, regardless of whether the opposing counsel actually questions the declarant. Wolf, 839 F.2d at 1396 & n. 6. Exhibit 164e also many not have been offered for the truth of the matter asserted (as it seems to have been offered to show that Kent sent a copy of his statement to Sasser). For these reasons, we hold that the error, if any, in admitting these two documents was harmless.
 
 IV. PROPRIETY OF ALLEN CHARGE
 
 27
 Both Kent and John challenge the district court's decision to give a supplemental Allen charge.[18] Although it had already given an Allen instruction, the district court gave the following instruction after the jury informed the court that it was deadlocked:
 
 
 28
 This is an important case. It has been a long and expensive trial. Your failure to agree upon a verdict will necessitate another trial.
 
 
 29
 I'm of the opinion that [t]his case cannot again be tri[ed] better or more exhaustively than it has on either side. It is, therefore, very desirable that you should agree upon a verdict.
 
 
 30
 I do not desire that any juror should surrender his or her conscientiously held convictions. On the other hand, each juror should perform his or her duty conscientiously and honestly according to the law and the evidence, and although the verdict to which a juror agrees must, of course, be his or her own verdict, the result of his or her own convictions, and not a mere acquiescence in the conclusions of his or her fellows, yet in order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor and with a proper regard and deference to the opinion of each other.
 
 
 31
 You should consider that the case must, at some time, be decided, and that you were selected in the same manner and from the same source from which any future jury must be, and there is no reason to suppose that the case will ever be submitted to twelve men and women more intelligent, more impartial, or competent to decide it, or that more or clearer evidence will be produced on one side or the other.
 
 
 32
 You may conduct your deliberations as you choose, but I suggest that you continue your deliberations, mindful of my prior instructions, and considering all of them as a whole, but I want you to do it with a fresh start Monday morning at 9:30.
 
 
 33
 V R. 634-35. We find that the instruction was not improper on the facts of this case.
 
 
 34
 We have previously held that " 'although it is a preferred rule of procedure that an Allen instruction be given the jury at the same time as other instructions, it is not a per se rule.' " United States v. Butler, 904 F.2d 1482, 1488 (10th Cir.1990) (quoting United States v. McKinney, 822 F.2d 946, 951 (10th Cir.1987)) (emphasis in original); see United States v. Porter, 881 F.2d 878, 889 (10th Cir.), cert. denied, 493 U.S. 944 (1989). Allen charges are proper if they are not impermissibly coercive. Porter, 881 F.2d at 888. In Porter, we identified several factors relevant to the question of whether the taint of coercion was present: the language of the instruction; its incorporation with other instructions; and the timing of the instruction, including whether it was given before the jury reached a deadlock. Id. at 888, 889.
 
 
 35
 The supplemental Allen charge at issue in this case was noncoercive. The language of the instruction itself was quite similar to the instructions in Butler and Porter, encouraging jurors to continue deliberations but not to return a verdict at the expense of their convictions. See Butler, 904 F.2d at 1488; Porter, 881 F.2d at 889. And, like the instruction in Porter, the instruction here was not directed specifically at jurors holding the minority view, thus reducing the possibility of coercion. Porter, 881 F.2d at 889 (citing Lowenfield v. Phelps, 484 U.S. 231 (1988)). As in Porter, the judge here further alleviated any sense of coercion by excusing the jury from deliberations for the weekend.[19] See Porter, 881 F.2d at 889 (excusing jury until next morning). Moreover, the fact that the jury ultimately returned a verdict on only some of the counts, remaining deadlocked on others, suggests that the jurors did not in fact feel pressured to resolve their differences just to return a verdict.[20] Consequently, we hold that the district court did not err in giving the supplemental Allen charge.
 
 
 36
 V. ALLEGEDLY PREJUDICIAL COMMENTS BY DISTRICT COURT
 
 
 37
 Kent next contends that the district court made unnecessary and prejudicial comments during the trial that denied him the right to a fair trial, and asserts that his convictions must be reversed and remanded for a new trial as a result. We disagree.
 
 
 38
 "A trial court has the broad discretion 'to comment reasonably upon the evidence, being careful not to become an advocate for any of the parties.' " United States v. Pearson, 798 F.2d 385, 387 (10th Cir.1986) (quoting United States v. Baker, 638 F.2d 198, 203 (10th Cir.1980)). Where, as here, the defendant fails to object at trial to the district court's allegedly prejudicial statements, we may only reverse the district court if the statements constituted plain error. Id. (citing United States v. Monaco, 700 F.2d 577, 581 (10th Cir.1983)). We do not believe that the district court committed any error in making the challenged statements, much less plain error.
 
 
 39
 Kent challenges comments made by the district court at three points in the trial. The first comments occurred during the government's cross-examination of Kent, at which time the government was attempting to ascertain whether or not John's attorney was present at a conversation concerning Kent's communications with John during the Fall of 1985:
 
 
 40
 Q: Now, you testified on direct that during the lunch break you and your attorney, Mr. Isaacs, had a conversation about your testimony earlier this morning; is that correct?
 
 
 41
 A: That is correct.
 
 
 42
 Q: And the conversation you had with Mr. Isaacs over the noon hour concerned your testimony about your communications with your brother, John Bizzell, in the fall of 1985; is that correct?
 
 
 43
 A: That is correct.
 
 
 44
 Q: Now, in fact, wasn't Mr. Ron Evans, who represented your brother, present at that conversation during the noon hour?
 
 
 45
 A: He was present.
 
 
 46
 Q: And that took place right out here in the hallway; didn't it?
 
 
 47
 A: I don't know if it did.
 
 
 48
 Q: You were there, were you not, Mr. Bizzell?
 
 
 49
 A: I had went to lunch. I didn't stay in the hallway. I used the rest room, and I believe we--we went to lunch.
 
 
 50
 Q: I'm asking you about your conversation with Mr. Isaacs over the noon hour.
 
 
 51
 A: Okay.
 
 
 52
 Q: And I'm asking you, wasn't your brother's lawyer, Mr. Evans, present at that conversation?
 
 
 53
 A: Mr. Evans was present at lunch with us.
 
 
 54
 THE COURT: Did you hear the question, Mr. Bizzell? Was he present at the conversation you're being asked about?
 
 
 55
 THE WITNESS: Yes, sir, he was.
 
 
 56
 THE COURT: Next question.
 
 
 57
 IV R. 546-47. The district court here was simply attempting to clarify a line of questioning that had somehow become muddled. Cf. Pearson, 798 F.2d at 387. We do not believe that the district court committed plain error in doing so.[21]
 
 
 58
 The second comment occurred during the government's attempt to question Kent as to whether he had transferred properties to his father for the sole purpose of placing HUD-insured financing on them, before taking them back after a short period of time. After the government had attempted to ask the question three times, receiving nonresponsive answers each time, Kent's attorney objected on the basis of Federal Rules of Evidence 402 and 403. The district court overruled the objection. IV R. 571-72. The government then asked the question two more times, receiving another nonresponsive answer after the first time and prompting Kent's attorney to object after the second time on the same basis as before. The district court's response was understandable: "I understand your objection. I've overruled it. Answer the question please." IV R. 573. The government attorney began to rephrase the question, but the district court stopped her:
 
 
 59
 THE COURT: Just a minute. You don't need to repeat it, but you do need to answer it.
 
 
 60
 THE WITNESS: HUD loans were acquired, Your Honor, on the properties.
 
 
 61
 THE COURT: Ask your question one more time, and you answer it.
 
 
 62
 THE WITNESS: Okay.
 
 
 63
 IV R. 573. The district court did not plainly err in attempting to move along a line of questioning that was stagnating because of Kent's refusal to answer and his attorney's repetitious objection.
 
 
 64
 On the third occasion, the district court merely stopped the defense counsel's attempt to impeach a government witness with an allegedly prior inconsistent statement. The witness testified that she was an acquaintance of Sasser's and that she had run into him at restaurants from time to time, although she did not "meet" him at a restaurant. III R. 324, 325. Kent's attorney attempted to impeach her with her prior testimony to the grand jury, the gist of which was that she had met Sasser and his wife at restaurants, "I mean, you know, run into them ... we just ran into each other." III R. 326. We, like the district court, are at a loss to see why these statements are inconsistent. The district court therefore did not err in putting a stop to this improper impeachment. Because we hold that the district court did not err, much less plainly err, in making the above comments during the trial, need not address Kent's argument that the cumulative effect of these comments was error. See United States v. McIntyre, 1993 WL 189890 * 14 (10th Cir.). We conclude that Kent was not denied the right to a fair trial.
 
 VI. RESTITUTION
 
 65
 Kent contends that the district court erred in ordering him to pay Talman restitution in the amount of $57,147.59 under the Victim and Witness Protection Act, 18 U.S.C. §§ 3663, 3664 ["VWPA"]. We disagree. Under 18 U.S.C. § 3664(d) any dispute as to the proper amount of restitution is to be resolved by the district court by a preponderance of the evidence. The burden of demonstrating the amount of loss sustained by the victim as a result of the offense is on the government, while the burden of demonstrating the financial resources of the defendant and the defendant's dependents is on the defendant. 18 U.S.C. § 3664(d). We review the district court's factual findings underlying the restitution order under a clearly erroneous standard. 18 U.S.C. § 3742(e); United States v. Teehee, 893 F.2d 271, 274 (10th Cir.1990). We review the amount of the restitution order for an abuse of discretion. United States v. Rogat, 924 F.2d 983, 985 (10th Cir.), cert. denied, 111 S.Ct. 1637 (1991).
 
 
 66
 Restitution under the VWPA is limited to the amount of loss caused by the specific conduct that is the basis of the offense of conviction. Hughey v. United States, 495 U.S. 411, 413 (1990); United States v. Wainwright, 938 F.2d 1096, 1098 (10th Cir.1991). Kent contends (1) that the government failed to prove by a preponderance of the evidence that Talman suffered a loss of $57,147.59 that resulted from Kent's criminal conduct; (2) that the district court erred in refusing to require Talman to disclose information regarding the amount of its loss; (3) that the district court erroneously included consequential damages in its restitution order; (4) that the government erred in failing to make findings as to disputed fact issues under Federal Rule of Criminal Procedure 32(c)(3)(D); and (5) that the district court failed to take into account his financial resources, his earning ability, and the needs of his dependents in setting the amount of restitution. We will address each contention in turn.
 
 
 67
 A. Adequacy of Proof to Support the Restitution Award
 
 
 68
 Kent contends the evidence did not support the restitution award. The district court found by a preponderance of the evidence that $57,147.59 of Talman's damages were attributable to Kent. K.B. Br. Tab C. We believe that there was sufficient evidence to support this finding. Talman offered a chart, which we have modified slightly, showing the loss it suffered from loans made on the first two properties that Kent sold to Sasser:
 
 
 69
 1017 Tall Oaks 1033 Tall Oaks
Original Loan Amount 48,993 48,993
Present Unpaid Balance 48,660.14 48,660.14
Accrued Interest 9,324.58 9,537.47
Escrow Advance Balance 2,944.14 2,936
Late Charges 225.96 227.40
Sale Proceeds (17,509.71) (20,190.53)
------------------------------------------------------
Total Loss 43,645.11 41,170.48
 
 
 70
 VI R. 720. Talman then subtracted from these loss figures settlement payments that Talman received from a related case.[22] This resulted in a net loss on the 1017 Tall Oaks property of $29,407.11 and a net loss on the 1033 Tall Oaks property of $27,740.48. VI R. 718. The district court thus ordered restitution in the sum of these two loss figures: $57,147.59. We cannot say that the district court abused its discretion in finding by a preponderance of the evidence that Kent caused Talman to suffer this loss.[23]
 
 
 71
 B. Failure of District Court to Require Talman to Disclose Information Regarding Talman's Loss
 
 
 72
 Kent next contends that the district court abused its discretion in failing to order Talman to disclose information about compensation that Talman may have received from third parties for its losses and that should be subtracted from Kent's restitution liability.[24] We hold that there was no need for the district court to order Talman to disclose the requested information, as Talman voluntarily disclosed it.
 
 
 73
 First, Kent asked the district court to order Talman to provide information concerning whether the restitution sought by Talman included a credit for payments received by Talman as a result of the settlement of a civil suit between Talman and Southwest Title & Trust Company. K.B. Tab L at 2. However, Talman's November 25, 1991, letter requesting restitution stated (1) that it had received a lump sum settlement payment from a defendant in a related action, and (2) that it had allocated the settlement proceeds among fifteen loans involved in all suits related to the suit against the Bizzells on the basis of each loan's proportionate outstanding loss. VI R. 718. Thus, Talman calculated that the settlement payment reduced its loss by $14,238 on the 1017 Tall Oaks property and by $13,430 on the 1033 Tall Oaks property (the two properties underlying Kent's conviction). VI R. 718, 720. In a January 9, 1992, letter sent after Kent filed his objection to the presentence report, Talman again reiterated that it had included the settlement payment in its calculation of its loss. VI R. 705-06. Although neither of the letters indicated that Southwest was the settling defendant, the January letter did state that "[t]here are no other parties from which [Talman] can receive any further recoveries." VI R. 706. Talman therefore released all information that it had concerning settlement payments, and it was unnecessary to order it to do so.
 
 
 74
 Second, Kent requested information about the amount of payments received by Talman on an insurance bond. In the January 9 letter, Talman admitted that it had reached a settlement with its bond carrier for a lump sum payment for damages, attorneys fees, and expenses Talman incurred in relation to more than 100 fraudulent loans, including the loans involved in the Bizzell case. However, Talman also noted that pursuant to the settlement agreement, the bond carrier granted Talman full discretion to prosecute or settle the litigation and recover any losses, and that the terms of the bond would govern any such recoveries. VI R. 706. Under the terms of the bond, any recovery by Talman or the bond carrier that exceeds Talman's attorneys' fees, expenses, and outstanding losses must be paid to the bond carrier. Id. Thus, any restitution that Talman would receive from Kent would not be "restitution with respect to a loss for which the victim has received or is to receive compensation," as Talman would be required to remit any amount exceeding its damages to the carrier. In light of Talman's duty to remit restitution proceeds to the bond carrier, thus precluding double recovery, we hold that the district court did not err in refusing to order Talman to disclose the amount it received in settlement with the carrier. See United States v. Clark, 901 F.2d 855, 857 n. 3 (10th Cir.1990).
 
 
 75
 C. Inclusion of Consequential Damages in Restitution
 
 
 76
 Kent asserts that the restitution award appeared to include sums that he contends are not properly included in a restitution award, such as attorney fees, interest, and other "consequential damages" not compensable in a restitution award.[25] We have held that under the VWPA, a victim may recover only those losses sustained as a result of the offense, or those expenditures that are " 'directly related' " to the defendant's criminal conduct. United States v. Patty, 992 F.2d 1045, 1049 (10th Cir.1993) (quoting United States v. Diamond, 969 F.2d 961, 968 (10th Cir.1992)). In Patty, we construed Diamond as holding that attorneys' fees incurred by a victim to recover his property are not directly related to the defendant's conduct and thus are not recoverable under the VWPA. Patty, 992 F.2d at 1049. Here, however, Talman's calculation of its loss clearly did not include attorney's fees, see VI R. 720, and Kent does not indicate why he believes they were included in the loss calculation.
 
 
 77
 Next, Kent challenges the inclusion of accrued interest. We also held in Patty that prejudgment interest is recoverable under the VWPA. Patty, 992 F.2d at 1050. Thus, the district court could not have erred in including prejudgment interest in the restitution calculation.[26] Finally, the restitution amount includes $453.36 in late charges. We find no abuse of discretion in concluding that such costs are to compensate Talman for administrative costs incurred because it did not receive timely payment of the money due to it.
 
 
 78
 D. Failure of District Court to Make Specific Findings Regarding Kent's Objections to the Presentence Report
 
 
 79
 Kent objected to the probation officer's statement in the presentence report that Talman suffered losses in excess of $300,000. K.B. Br. Tab L at 2-3. He renewed his objection after the district court determined at the sentencing that the total loss suffered by Talman was actually $224,014.02, but that Kent's liability for restitution was subject to revision upon a determination of how much of the loss was attributable to him. K.B. Br. Tab B; VI R. 722. Kent asserts that the court erred in failing to make written findings under Federal Rule of Criminal Procedure 32(c)(3)(D) as to his objections or to make a determination that such findings were unnecessary because the controverted matter would not be considered.[27] We find no error.
 
 
 80
 All of the objections that Kent made to the district court and continues to raise on appeal relate to the issue of what portion of Talman's loss was attributable to Kent's offense conduct.[28] K.B. Br. Tab L at 2-3. In finding the total loss attributable to Kent to be $57,147.59 in its April 21, 1992 order, the district court made a written, factual finding sufficient to meet the requirement of a written finding in Rule 32(c)(3)(D). See United States v. Teehee, 893 F.2d 271, 276 (10th Cir.1990) (holding that where the defendant put in issue the total amount of the loss sustained as a result of the defendant's activities, the district court's finding that the victim's loss was between $610,000 and $837,000 was sufficient to satisfy Rule 32(c)(3)(D)). However, because Kent did not include an official copy of the presentence report in the record, we are unable to discern whether this finding has been appended to the presentence report as required by Rule 32(c)(3)(D). We therefore remand not for resentencing but rather to permit the district court to ascertain whether this factual finding is appended to Kent's presentence report, and, if not, to append the finding to the report. See United States v. Gattas, 862 F.2d 1432, 1435 (10th Cir.1988) (and cases cited therein).
 
 E. Consideration of Kent's Ability to Pay
 
 81
 In assessing an award of restitution, the district court is to consider the financial resources of the defendant and the financial needs and earning ability of the defendant and the defendant's dependents. 18 U.S.C. § 3664(a). Citing a Seventh Circuit case, Kent first asserts that it is an abuse of discretion for the district court to order restitution if there is no evidence in the record that the district court considered these matters. K.B. Br. 44 (citing United States v. Peden, 872 F.2d 1303, 1311 (7th Cir.1989)). Peden, however, is not the law in this circuit. We have held that although the VWPA requires the sentencing court to consider the defendant's financial condition, the judge need not specifically recite his findings regarding that condition. United States v. Rogat, 924 F.2d 983, 986 (10th Cir.1991), cert. denied, 111 S.Ct. 1637 (1991). Explicit factual findings in the record are only required when there is "substantial ambiguity as to whether the judge considered the statutory factors." Rogat, 924 F.2d at 986. There does not appear to be any ambiguity here as to whether the district court considered Kent's financial information. As Kent notes in his brief, he provided the district court with financial statements indicating his financial resources and the resources and needs of his dependents. K.B. Br. 44 (citing K.B. Br. Tab K pp 19-22). At the sentencing hearing the district court noted that it had read Kent's objections and that Kent's viewpoints had been taken into consideration. K.B. Br. Tab M at 2. Nothing in the record suggests that the district court ignored this information while reviewing the presentence report. We therefore hold that the district court did not err in failing to state on the record that it considered Kent's financial information. See United States v. Williams, 1993 WL 191328 * 2, 6 (10th Cir.) (holding there was adequate evidence that district court considered needs of dependents where the presentence report, which the court expressly adopted, detailed the defendant's financial circumstances and employment history and disclosed that his dependents were receiving government assistance); Rogat, 924 F.2d at 985 (holding that there was no ambiguity as to whether district court considered statutory factors where the district court indicated that he was aware of the uncontested representations regarding the defendants' financial status, stated that he had "everything in mind, if it's in the Probation Department's reports," which contained the financial information, and noted the unlikelihood of the defendants repaying the restitution any time soon).
 
 
 82
 Kent next asserts that the district court abused its discretion by not reducing the restitution award in light of his financial situation. K.B. Br. 45. A restitution order will be upheld if the evidence indicates that the defendant has some assets or earning potential and thus possibly may be able to pay the amount ordered. Rogat, 924 F.2d at 985. The possibility of repayment, however, cannot be solely based on chance. Id. A defendant's indigency is not a bar to restitution; however, we will not uphold the district court's exercise of discretion absent any evidence that the defendant is able to satisfy the restitution order. Id. There was evidence in the record suggesting that Kent would be able to satisfy the restitution award. The presentence report indicates that it appeared that Kent had some ability to pay. K.B. Br. Tab K p 19. The report also indicates that Kent still has remaining real estate investments that could be liquidated.[29] Tab K p 21. We believe that this is sufficient evidence and that the district court did not abuse its discretion in ordering Kent to pay restitution of $57,147.59.[30]
 
 CONCLUSION
 
 83
 We AFFIRM the judgment of the district court, except that this matter is REMANDED to the district court so that the district court may determine whether its order determining the amount of loss attributable to Kent Bizzell has been attached to his presentence report. See United States v. Gattas, 862 F.2d 1432, 1435 (10th Cir.1988).
 
 
 
 *
 John C. Godbold, Senior Circuit Judge for the Eleventh Circuit, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 For ease of reference, we will simply refer to the HUD-administered FHA loans as "HUD-insured" loans
 
 
 [2]
 In addition, the government offered evidence that other documents contained misrepresentations. For example, the sale contracts recited that Sasser had deposited earnest money in amounts ranging from $1000 to $2600 with "n/a Realtor." K.B. Br. Tab H Ex. 2, 18; I.R. 63, 75; II R. 219, 222, 226, 228, 229. Although trial testimony indicated that the "n/a" signified that Sasser was depositing his own earnest money with the Bizzells rather than with a realtor, I R. 53-54; II R. 174, 194, 204, both Kent and John told a HUD auditor that Sasser never paid them the earnest money, III R. 311, 312
 
 
 [3]
 For example, the settlement statements for the sale of two properties on Tall Oaks Drive that Kent sold to Sasser indicated that Sasser paid Kent earnest money of $1000 and that Sasser paid his own acquisition costs including the fifteen percent downpayment. At the bottom of the settlement statement form, which represented that Sasser used his own money to pay the downpayment and his settlement costs, Sasser and Kent signed an acknowledgement that "[t]he Undersigned Acknowledges Receipt of this Settlement Statement and Agrees to the Correctness Thereof." Tab H Ex. 11 at 2, 28 at 2; I R. 59, 60-61, II R. 280, 282-83
 
 
 [4]
 The space provided does specify "commission paid at settlement." Kent contends that his commissions were paid the day before settlement and therefore should not have been noted in that space. However, Debby Mercer, who helped to close the loans at issue while working at Southwest Title and Trust Company, testified that the usual practice is to list the commission as "POC"--indicating "paid outside of settlement." II R. 267
 
 
 [5]
 The evidence suggested that perhaps Sasser's primary interest in purchasing the houses did not lie in keeping them. Sasser began setting up a deal for the sale of the five properties that he bought from John [the "Hillridge/Midridge properties"] shortly after his purchase of the properties closed. III R. 344-45. Sasser arranged to finance his purchase of five additional Tall Oaks properties from Kent by (1) obtaining a HUD-insured mortgage for each Tall Oak property, and (2) trading the Hillridge/Midridge properties to Kent for the rest of the purchase price on each Tall Oak property. III R. 288-93, 342, 344. Sasser received a trade-in credit of $8,000 on each of the Hillridge/Midridge houses, even though he had paid more than $60,000 for at least two of the houses. II R. 219, 226. On June 13, 1986, Sasser and Kent closed this deal. III R. 342. Kent began disposing of the Hillridge/Midridge properties two and one-half months later, and by February 1, 1987, had sold all five Hillridge/Midridge properties--originally owned by his brother John--to five different people, who assumed the HUD-insured mortgages that Sasser had put on them. III R. 345-46. Kent told FBI Agent Markey that the buyers were people who needed assumable loans because they had bad credit. III R. 355. On June 22, 1987, Sasser sold all seven Tall Oaks properties to Mary Caldwell, who assumed the HUD-insured mortgages on the properties. III R. 346. This sale occurred during HUD's audit of Talman mortgage and the day before HUD auditor Sharon Shackelford Howell interviewed Sasser. III R. 347
 
 
 [6]
 The indictment also charged Sasser with mail fraud, making additional false statements to HUD, and making a false statement to a HUD auditor. K.B. Br. Tab A, Counts 2, 3-9, 21
 
 
 [7]
 Section 1010 provides:
 Whoever, for the purpose of obtaining any loan ... from any ... corporation with the intent that such loan ... shall be offered to or accepted by the Department of Housing and Urban Development for insurance ... or for the purpose of influencing in any way the action of such Department, makes ... any statement, knowing the same to be false ... shall be fined not more than $5,000 or imprisoned not more than two years, or both.
 
 
 [8]
 Although both Lovett and Leach state that the third element requires a showing of a purpose to obtain a loan "and" to influence HUD, we modify their test to require a showing of either a purpose to obtain a loan "or" influence HUD, as that is all the statute requires
 
 
 [9]
 Sasser also received a commission from Talman for originating the loans. II R. 165
 
 
 [10]
 John failed to designate a transcript. We are accordingly relying on the transcript designated by Kent, the documentary evidence in the appendix, and undisputed statements in the brief. It is, of course, the appellant's burden to provide a sufficient record on appeal to enable us to evaluate his insufficiency of the evidence claim. To the extent that an appellant fails to do that, he fails to carry his burden on appeal of showing that the evidence was insufficient to support the conviction. See United States v. Vasquez, 985 F.2d 491, 495 (10th Cir.1993) (holding that the failure to file a transcript precludes review of a conviction for sufficiency of the evidence)
 
 
 [11]
 We reject the defendants' argument that because HUD made a firm commitment to insure the loans twenty days prior to closing, HUD could not be influenced by false statements at closing regarding the source of the funds. Mumford testified that the firm commitment that HUD issues is a firm commitment to insure the loan if it is in accordance with HUD's requirements. I R. 34035. After closing HUD reviews the closing documents, including the settlement statement to ensure all documents are in order before issuing the mortgage insurance certificate. I R. 35, 81
 
 
 [12]
 The parties give us no information concerning the distributive share other than what appears in Mumford's testimony
 
 
 [13]
 The right to a distributive share appears to be largely at the discretion of the Secretary of HUD. Under § 1711(c), the Secretary of HUD is "authorized to distribute to the mortgagor a share of the [fund] in such manner and amount as the Secretary shall determine to be equitable...." Section 1711(d) provides that the mortgagor's interest in the premium fund is not vested
 
 
 [14]
 The record is unclear as to whether Juror Edmunds obtained HUD financing for the purchase of her home or whether she simply assumed a pre-existing HUD-insured mortgage on the home
 
 
 [15]
 We find distinguishable the cases cited by the defendants in which courts have held that a stockholder in a company that is party to a lawsuit is incompetent to sit as a juror, see Gladhill v. General Motors Corp., 743 F.2d 1049, 1050-51 (4th Cir.1984); Chestnut v. Ford Motor Co., 445 F.2d 967, 971 (4th Cir.1971), as is a juror that is interested in an insurance or indemnity company insuring a defendant against loss in a case, see Mack Trucks, Inc. v. Arrow Aluminum Castings, Co., 510 F.2d 1029, 1034 (5th Cir.1975) (applying Georgia law). See generally 47 American Jurisprudence §§ 322, 325 (2d ed. 1969 & April 1993 Supp.); 50 C.J.S. § 213, 214 (1947 & 1993 Supp.). The gist of these cases is encompassed in the rule enunciated above that tests bias by the directness of the financial interest
 
 
 [16]
 Because the defendants make no arguments regarding the first two elements and because we believe that the evidence recounted in the fact section above shows that district court did not abuse its discretion in finding that the government proved by a preponderance of the evidence the existence of and Kent and John's membership in the conspiracy, we will focus on the "in furtherance of" requirement
 
 
 [17]
 The defendants include very few of the challenged exhibits in the record, and often fail to inform us of the dates that Sasser's statements were made. After a careful analysis of the heavily redacted trial transcript in Kent's appendix, we have determined that the majority of the objected-to statements by Sasser appearing in exhibits and Larry Mumford's testimony occurred before the sale of the seven properties were closed, and were clearly in furtherance of the conspiracy
 Government Exhibits 4, 6, 20, 22, 36-39, 53-56, 57a-j, 70-72, 94-96, 98, 104-107 (none of which were included in the record) appear from the transcript to be documents prepared by loan processors and closers Pasternak, Mercer, and Connors from information provided by Sasser. VI R. 645A, 649-50. It appears, then, that Sasser's statements underlying the documents were necessarily made before the loans were closed, in the course of obtaining the loans. (Although the defendants challenged below the fact that Pasternak, Connors, and Mercer recorded Sasser's statements on Confrontation Clause grounds, they do not raise that objection on appeal.)
 Government Exhibits 3 and 19 were Sasser's application for a commitment for a HUD-insured loan on 1017 Tall Oaks and 1033 Tall Oaks and were signed by Sasser on December 19 and 17, 1985, respectively. K.B. Br. Tab H. Government Exhibits 5 and 21 were the HUD Certificates of Commitment on the two Tall Oaks properties, which Sasser signed on January 28, 1986, certifying that he paid the downpayment and other acquisition costs with his own funds. K.B. Br. Tab H. These documents were obviously executed in furtherance of the conspiracy, as they were required to obtain and close the HUD-insured loans. We therefore find that the district court did not abuse its discretion in admitting these documents under the coconspirator exception.
 We are unable to review whether Government Exhibits 164a-d were properly admitted, because they were not included in the record. Moreover, the defendants do not indicate where in the record they were discussed in any detail, and we have not been able to find them. We are therefore unable to determine when the statements made by Sasser were made. Thus, defendants fail in the burden on appeal to show error with regard to those documents. See United States v. Vasquez, 985 F.2d 491, 495 (10th Cir.1993) (holding that challenges to the admission of evidence will not be considered by the Court of Appeals in the absence of an adequate record).
 
 
 [18]
 The Allen charge derives its name from jury instructions approved in Allen v. United States, 164 U.S. 492 (1896)
 
 
 [19]
 Although the jurors here, unlike in Porter and other cases approving the use of an Allen charge, indicated that they did not believe that further deliberations would be fruitful, we do not believe this requires a finding of coercion in this case. In this case, unlike the cases cited by the defendants, the court suggested to the jury that, in fact, they need not continue deliberations if they so chose:
 You may conduct your deliberations as you choose, but I suggest that you continue your deliberations, mindful of my prior instructions....
 V R. 634-35 (emphasis added).
 
 
 [20]
 Although it is true that the supplemental Allen instruction here was not given with other instructions and was given after the jury reached a deadlock--both factors to be considered under Porter--those circumstances will usually be present when a supplemental Allen charge is given. We do not find such factors to be a bar where, as here, there are no other indicia of coercion. A contrary holding would render meaningless our cases holding that an Allen charge given after the jury has commenced deliberations is not per se improper
 
 
 [21]
 Kent asserts that the district court "raised his voice" and that his tone was "severe and impatient." K.B. Br. 34. However, we are unable to discern the court's tone from the "cold record." United States v. Robinson, 635 F.2d 981, 984-85 n. 2 (2d Cir.1980), cert. denied, 451 U.S. 992 (1981). Consequently, in the absence of a contemporaneous objection or evidence of the court's tone in the record, we are unable to review such a contention. See United States v. Block, 755 F.2d 770, 776 (11th Cir.1985)
 
 
 [22]
 The settlement payment related to fifteen loans, which included the two loans that gave rise to Kent's offense of conviction, but did not allocate a specific amount to any individual loan. Talman therefore allocated the settlement payment among the fifteen loans on the basis of each loan's proportionate outstanding loss. Aplt.App. 718
 
 
 [23]
 Kent cites 18 U.S.C. § 3663(b)(1)(B)(ii) to support his claim that the district court incorrectly valued the property that secured the seven loans. He contends that the district court should have credited him with either the value of the property as of the date the property was returned or as of the date of the loss under § 3663(b)(1)(B)(ii). K.B. Br. 39-40. However, the property lost as a result of the crime here was not the property securing the loans, but rather the unpaid balance of the loan. The property securing the loan served merely as a mechanism to permit the mitigation of damages. We therefore find that the district court properly calculated the restitution award by subtracting the sale proceeds from the outstanding loan balance
 We also reject Kent's assertion that he did not proximately cause the damages suffered by Talman, because the defaults occurred only after he sold the properties. However, because the FHA-insured mortgages are freely assumable, without the buyer being required to meet any financial requirements, we believe that Kent reasonably should have foreseen that subsequent buyers of the property might default on the loans, thus causing Talman damage. We therefore do not believe that the district court clearly erred in implicitly finding that Kent's actions underlying his conviction proximately caused the damages suffered by Talman. Cf. United States v. Patty, 992 F.2d 1045, 1051 (10th Cir.1993) (holding that submission of false reports to obtain loans caused the lender's losses on the loans); United States v. Teehee, 893 F.2d 271, 274-75 (10th Cir.1990) (holding that the defendant, who had illegally used Sprint phone access codes for his own phone calls and who had sold the codes to others for similar illegal use, could be liable for restitution for losses caused by "downstream" users of the phone codes).
 
 
 [24]
 The VWPA, 18 U.S.C. § 3663(e)(1), provides:
 The court shall not impose restitution with respect to a loss for which the victim has received or is to receive compensation, except that the court may, in the interest of justice, order restitution to any person who has compensated the victim for such loss to the extent that such person paid the compensation.
 
 
 [25]
 Kent also asserted that the method of calculation of the restitution award had not been disclosed to him. However, Talman's November letter requesting restitution clearly outlined its method of calculating damages. VI R. 720
 
 
 [26]
 Although the record suggests that Kent is complaining of prejudgment interest, that is not entirely clear. However, our result would be the same even if post-judgment interest were involved. See United States v. Rochester, 898 F.2d 971, 983 (5th Cir.1990) (upholding the inclusion of pre- and post-judgment interest on a restitution award under the VWPA, because the purpose of the VWPA, to ensure that wrongdoers make their victims whole, would be served by an award of post-judgment interest); United States v. Kress, 944 F.2d 155, 159 (3d Cir.1991) (upholding award of post-judgment interest under the VWPA, because the victim otherwise would suffer a loss if restitution were not paid promptly, since it could not invest or earn interest on the money), cert. denied, 112 S.Ct. 1163 (1992); cf. Patty, 992 F.2d at 1050 (stating same in context of prejudgment interest); United States v. Smith, 944 F.2d 618, 626 (9th Cir.1991) (same), cert. denied, 112 S.Ct. 1515 (1992). We therefore hold that the district court could properly include post-judgment interest in its award of restitution
 
 
 [27]
 Federal Rule of Criminal Procedure 32(c)(3)(D) provides:
 If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons.
 
 
 [28]
 In his objections to the district court, Kent asserted that the total loss suffered by Talman, for which Kent could be held liable, (1) should include proper credit for settlement payments, bond payments, and the value of money and property received at the time of foreclosure on the mortgage notes; (2) should not include sums not properly included in a restitution award, such as attorneys fees, contract interest, and other contractual expectations; and (3) should actually not be attributable to Kent at all, on the theory that he did not proximately cause Talman's loss since the defaults occurred after he sold the properties
 
 
 [29]
 Because Kent did not include his financial statement in the record, on appeal he presents an inadequate record for us to find that the district court erred in its conclusion that Kent had the ability to pay restitution. Cf. United States v. Vasquez, 985 F.2d 491, 495 (10th Cir.1993)
 
 
 [30]
 For the same reason, we believe that the district court did not abuse its discretion in requiring, by operation of 18 U.S.C. § 3663(f)(3), that the restitution be paid immediately rather than within five years after Kent's release from prison. See K.B. Br. 47-48