**DAVID GLEN, INC., d/b/a Downtown Saab, David Snower and Emanuel Annerino, Plaintiffs,**

v.

**SAAB CARS USA, INC., Defendant.**

No. 93 C 6346.

United States District Court, N.D. Illinois, E.D.

Oct. 25, 1993.

Richard M. Karr, Jonathan Paul Geen, Hardt & Stern, P.C., Chicago, IL, for plaintiffs.

Richard C. Godfrey, David Coulson, Kirkland & Ellis, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiffs David Glen, Inc. d/b/a Downtown Saab ("Downtown"), David Snower and Emanuel Annerino petition this court for a temporary restraining order to enjoin defendant Saab from (1) terminating the current franchise agreement with Downtown, and (2) appointing the franchise to any other party. For the reasons set forth below, we dismiss David Snower and Emanuel Annerino as plaintiffs in this action, deny plaintiffs' motion for a temporary restraining order, and direct the parties to Magistrate Judge Buck-lo forthwith for an evidentiary hearing and her Report and Recommendation in connection with their request for a preliminary injunction.

## I. Background

In 1990, Saab discovered a factory defect which required car owners to bring their cars in for certain recall repairs. Approximately 60 cars sought service at Downtown. According to petitioners, unbeknownst to Downtown, one of its mechanics, Ron Goetz, falsified documents to show that he had done the recall repairs when in fact he had done nothing. Downtown submitted these documents to Saab for reimbursement for parts and labor. After a "repaired" car was towed into Downtown for further work in July, 1993, Saab employees, with the help of Downtown's Service Manager, discovered the fraud. According to Saab, Downtown's president, Perry Snower, along with unnamed other Downtown employees, arranged to cover-up the fraud by performing recall repairs on a "repaired" car *after* it was returned for continuing malfunctions. To compound this deceit, Snower apparently burned or authorized employees to burn the recall part so it would appear that the part had been installed originally.[1] Furthermore, Saab alleges that Perry Snower misrepresented to State Farm Insurance, which insured one of the cars at issue, that the recall had actually been performed, and that any damage was due to a faulty recall unit. Accordingly, State Farm sought payment from Saab to repair the car.

On August 19, 1993, Saab notified Downtown that it was terminating the franchise effective October 24, 1993. Subsequently, Saab discovered additional evidence of wrongdoing at Downtown. After conducting an audit of Downtown's inventory, Saab learned that Downtown had submitted false sales reports to Saab in order to collect certain sales incentives being offered by the distributor. Furthermore, Saab claims that Downtown has submitted a sizeable number of phony warranty claims to Saab for reimbursement. In short, Saab describes a sce-

1. Saab offers the affidavit of Michael Race, Saab's District Parts and Service Manager, in support of this claim and even supplies photo-graphs which purport to demonstrate Downtown's tampering with the phony repair job.

nario of wide-ranging fraud involving both management and staff members at Downtown.

For its part, Downtown contends that the phony recall repairs were the work of a single rogue mechanic, and maintains that it has done everything possible, without Saab's cooperation, to contact those customers who received recall repairs and remedy any wrongdoing. In addition, Downtown indicates that it sought to mend its relationship with Saab to no avail. Downtown also challenges the audit results which demonstrate that it has been falsifying its warranty claims. Finally, although Downtown acknowledges submitting false sales and inventory figures to Saab, and collecting the corresponding incentives, it claims that it did so with the acquiescence, and even encouragement, of Saab.

After trying to reconcile with Saab, Downtown sought buyers for the franchise. On October 6, 1993, Downtown entered into a buy/sell agreement with David Snower (Perry Snower's son) and Emanuel Annerino (currently a Sales Manager at Downtown). Snower previously operated the Metro Toyota dealership, while Annerino used to be a Saab employee. To date, Saab has not approved the transfer or even processed the application.

In their complaint, plaintiffs request an injunction ordering Saab to approve the transfer and, in the event that fails, an injunction preventing Saab from cancelling the current franchise agreement with Downtown. In the meantime, Downtown asks for a TRO to maintain the status quo.

## II. Discussion

### A. Standing

■ We first consider defendant's contention that plaintiffs David Snower and Emanuel Annerino lack standing. As a general rule, the Illinois Motor Vehicle Franchise Act ("IMVFA"), 815 ILCS 710/1 et seq. (West

1993), which provides the putative basis for this action, grants standing only to franchisees and motor vehicle dealers. 815 ILCS 710/13. Whether either or both of these classes has standing under any given section of the IMVFA, however, depends upon the individual section at issue. *See Northwestern Buick, Inc. v. Nissan Motor Corp.*, No. 89 C 9062, 1990 WL 43316, at *2–3 U.S.Dist. LEXIS 3462 at *5–6 (N.D.Ill. March 29, 1990) (right to enforce particular section of IMVFA depends upon status of putative plaintiff and party to be protected by section). We first note that David Snower and Annerino do not have standing to bring a claim under § 4(d)(6) of the IMVFA, which relates to franchiser termination of a franchise. That section clearly limits its scope to a franchisee or motor vehicle dealer whose existing franchise or selling agreement has been terminated or cancelled. Because David Snower and Annerino do not have any such agreement with Saab, they are not covered by § 4(d)(6). Accordingly, they lack standing to bring a claim under that section.[2]

■ We also find that David Snower and Annerino do not have standing under § 4(e)(11) of the IMVFA, which governs transfer approvals. For the purposes of this section, Snower and Annerino are merely potential successor franchisees. We note first that such parties are not granted standing generally under § 13. Given this fact, and considering the language of the section itself, we find that § 4(e)(11) is designed to protect only *existing* franchisees. It is the existing franchisee who submits the proposal for transfer and the existing franchisee who receives notice of the franchiser's reasons if it rejects the proposed successor franchisee. The potential successor franchisee is included in the section as an innocent bystander rather than as an active party. *See Postma v. Jack Brown Buick, Inc.*, No. 1–90–1546 (Ill. App.Ct. Sept. 21, 1992) (currently on appeal to Illinois Supreme Court).[3]

---

**2.** In addition, we note that David Snower and Annerino can not overcome their standing deficiencies by asserting the rights of an existing franchisee, Downtown Saab. *See, e.g., Helmig v. John F. Kennedy Community Consolidated School Dist.*, 610 N.E.2d 152, 156 (Ill.App.Ct.1993) (par-

ties do not have standing to assert the rights of others).

**3.** We further note that David Snower or Annerino's position as franchisee or motor vehicle dealer at a dealership *other than* Downtown is irrele-

## B. Temporary Restraining Order

■ A TRO should be granted only if the movant can show the existence of irreparable harm, the absence of an adequate remedy at law, a probability of success on the merits, that the threat of harm to the movant in the absence of a TRO outweighs the harm to the non-movant if an injunction issues, and that the public interest would not be disserved by the TRO. *United States v. Phillips,* 527 F.Supp. 1340 (N.D.Ill.1981). Because we find it to be dispositive, we consider first whether the petitioners have demonstrated a likelihood of success on the merits.

Under the Illinois Motor Vehicle Franchise Act ("Act"), a car distributor such as Saab may not cancel or terminate a franchise agreement without good cause. 815 ILCS 710/4(d)(6).[4] Additionally, distributors or manufacturers violate the Act if they refuse to approve a proposal to transfer the franchise to a qualified buyer. 815 ILCS 710/4(e)(11).[5]

■ We first consider whether the fraud perpetrated by Downtown constitutes "good cause" for terminating the franchise. Good cause exists where a franchisee fails to substantially comply with the franchise agreement or where the franchisee commits a breach of contract that affects the franchiser's ability to market its product. *Kawasaki Shop of Aurora v. Kawasaki Motor Corp.,* 188 Ill.App.3d 664, 136 Ill.Dec. 4, 10–11, 544

N.E.2d 457, 463–64 (1989) (adopting common law definition of "good cause" embodied in *Dayan v. McDonald's Corp.,* 125 Ill.App.3d 972, 81 Ill.Dec. 156, 172, 466 N.E.2d 958, 974 (1984)). Here, contrary to Downtown's version of events, Saab has submitted extensive evidence of widespread fraud implicating, among others, members of Downtown's current management. While an isolated incident by a rogue employee may not provide good cause for termination of a franchise, the ongoing deception outlined by Saab, including actions in direct violation of the franchise agreement, clearly support a finding of active participation by the petitioners.[6] Indeed, we find it inconceivable that the current management did not know of, and at least acquiesce in, the continued fraud at Downtown. Such behavior clearly falls within the realm of "good cause" for termination. Accordingly, we find that Downtown has virtually no chance of succeeding on the merits of its termination claim.

■ The other issue before us is whether Downtown is likely to succeed on its claim that Saab violated the IMVFA by refusing to approve, or even process, Downtown's proposed transfer of the franchise. As Saab points out, however, the IMVFA requires that a distributor notify a dealer sixty days prior to the effective date of termination, and grants a distributor sixty days to respond to a dealer's proposal to transfer its franchise. 815 ILCS 710/4(e)(6) & (11) (1993). Because

---

vant. The party claiming standing must be a franchisee or dealer at the franchise at issue. *Northwestern Buick,* 1990 WL 43316, at *2–3 U.S.Dist. LEXIS 3462 at *8–9.

**4.** 815 ILCS 710/4(d)(6) provides, in relevant part:

It shall be deemed a violation for a ... distributor ... (6) to cancel or terminate the franchise or selling agreement of a motor vehicle dealer without good cause....

**5.** 815 ILCS 710/4(e)(11) provides, in relevant part:

It shall be deemed a violation for a manufacturer, a distributor ... (11) to prevent or refuse to approve a proposal to establish a successor franchise at a location previously approved by the franchiser when submitted with the voluntary termination by the existing franchisee unless the successor franchisee would not otherwise qualify for a new motor vehicle dealer's license under the Illinois Vehicle Code

or unless the franchiser, having the burden of proof, proves that such proposed successor is not of good moral character or does not meet the franchiser's existing and reasonable capital standards....

**6.** In addition to obligating Downtown to provide quality car servicing to and maintain good relations with customers, the franchise agreement at issue expressly provided that Saab had the right to terminate the franchise if, among other things, the following occurred:

Any submission by Dealer to SAAB of a false or fraudulent application, or claims or statement in support thereof for reimbursement for warranty, special policy or [safety recall] campaign adjustments performed by Dealer, for parts wholesale compensation or for any other allowance, refund, credit, bonus or rebate under any other SAAB program, including without limitation any sales incentive program.

DeFusco Affidavit at ¶ 6.

Downtown did not submit a transfer proposal to Saab until after Downtown received notice that its franchise was being terminated, its ownership interest in the franchise necessarily expires before Saab is obligated to act on the proposed transfer. Accordingly, Downtown's likelihood of success on its transfer claim hinges on its chances of prevailing on its termination claim, which, as discussed above, are low. That is, if Downtown loses on the termination claim, it will no longer have any rights under the IMVFA, and consequently will be unable to enforce any transfer rights provided in the Act. Therefore, Downtown's likelihood of success on the merits of its transfer claim are, at best, negligible.[7] Because petitioners are unable to demonstrate a likelihood of success on the merits, we deny their petition for a temporary restraining order.

### III.  Conclusion

For the reasons set forth above, we dismiss plaintiffs David Snower and Emanuel Annerino from this action for lack of standing. In addition, plaintiffs' petition for a temporary restraining order is denied. However, their underlying request for a preliminary injunction remains. Accordingly, the parties are to proceed to Magistrate Judge Bucklo forthwith for an evidentiary hearing on the preliminary injunction. Magistrate Judge Bucklo is to file a Report and Recommendation with this court upon completion of the evidentiary hearing. A status hearing is set for December 3, 1993 at 10:00 a.m. It is so ordered.

---

7. We note that this interpretation of the statute is arguably at odds with that of Magistrate Judge Bobrick in *Wiese, Inc. v. American Honda Motor Co.*, No. 91 C 7127 (N.D.Ill. Feb. 20, 1992). However, Magistrate Judge Bobrick did not expressly address the fact that the transfer rights of a franchisee who proposes a transfer less than sixty days prior to an effective termination date automatically expire before a distributor is obligated to respond to the proposed transfer, as is the case here.