**ORMSBY MOTORS, INC., Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

No. 94 C 50001.

United States District Court, N.D. Illinois, W.D.

Jan. 26, 1994.

 

Stephen M. Haugh, Michael C. Poper, P.C., Crystal Lake, IL, Gerald B. Mullin, Rosenthal & Schanfield, P.C., Chicago, IL, for plaintiff.

Richard C. Godfrey, Douglas C. Gessner, Andrew B. Bloomer, Kirkland & Ellis, Chicago, IL, for defendant.

## ORDER

REINHARD, District Judge.

### INTRODUCTION

Plaintiff, Ormsby Motors, Inc. (OMI), filed a complaint in the circuit court of McHenry County, Illinois against defendant General Motors, Inc. (GM), seeking a declaration that GM's notice of termination of OMI's franchise to sell Pontiac automobiles and GMC trucks was in violation of the franchise agreements and the Illinois Motor Vehicle Franchise Act, 815 ILCS 710/4(d), and also seeking an injunction to prevent GM from terminating the franchise. GM removed the case to this court pursuant to 28 U.S.C. §§ 1441 and 1332 as OMI is an Illinois corporation with its principal place of business in McHenry County, Illinois, GM is a Delaware corporation with its principal place of business in Michigan and the amount in controversy exceeds $50,000. OMI moved for a preliminary injunction seeking to enjoin GM from terminating the franchise agreement, and the court conducted a hearing thereon.[1] Having heard the testimony of witnesses, received exhibits into evidence and considered the stipulations submitted by the parties, the court enters its findings of fact and conclusions of law.

### FACTS

OMI is a GM franchise vehicle dealership authorized to sell Pontiac automobiles and GMC trucks. It has been a Pontiac and GMC dealer since 1948 and holds a franchise for each from GM pursuant to a "Dealer Sales and Service Agreement" (franchise agreement). Article 14 of the franchise agreements contains various provisions related to termination of the agreement. Of particular relevance to this litigation is section 14.5.5 which sets forth one basis for termination and states, in pertinent part: "Submission by Dealer of false applications or claims for any payment, credit, discount, or

---

1. OMI originally sought a temporary restraining order but agreed to proceed expeditiously to a hearing on its motion for preliminary injunction. GM, in turn, agreed to maintain the status quo until the court issued its decision on the preliminary injunction motion. Subsequent to the hearing but prior to this court issuing its ruling on OMI's motion for preliminary injunction, OMI filed an emergency motion to defer the court's decision on its preliminary injunction motion. Following a hearing on the emergency motion, this court denied the motion.

allowance, including false applications in connection with incentive activities, where the false information was submitted to generate a payment to Dealer for a claim which would not otherwise have qualified for payment." GM seeks to terminate the franchise agreements based on this provision due to OMI's submission of false warranty claims.

It is undisputed that the false warranty claims at issue were prepared and submitted by Larry Kain.[2] Kain, a long-time OMI employee, had originally been employed by OMI on a full-time basis as a service manager and warranty claims administrator. OMI terminated his employment in 1987 when OMI learned from GM that Kain and a GM employee were involved in falsifying warranty claims unrelated to OMI's dealership. In the spring of 1990, Kain was hired back by OMI as an independent contractor on an hourly basis because several other persons did not work out in that position. In this new capacity, he was responsible for processing all warranty claims for OMI which were submitted to GM. According to Dwight Ormsby, former owner of OMI, Kain worked at night processing warranty claims. No other OMI employees worked with Kain or supervised him.

Richard Ormsby, president of OMI, testified that Kain performed the same warranty claim duties in 1992 and 1993 as he did before he was terminated in 1987. Kain's desk was in Richard Ormsby's office, and he had his own set of keys to the building. Kain was in charge of making all warranty coding and claims decisions at OMI in 1992 and 1993. The warranty claims decisions were made by Kain at least, in part, on OMI's premises.

Dwight Ormsby, Richard Ormsby, and Thomas Ormsby, vice-president of OMI, all denied having any knowledge of or involvement in Kain's 1992–93 falsification of warranty claims. Stacy Ormsby, whose duties included submitting warranty claims to GM via a computer system, denied any knowledge of any false warranty claims being submitted by anyone at OMI. She never discussed warranty claims with Kain. Dwight Ormsby was aware that Kain had been involved in submitting false warranty claims back in 1987 when he was told such by GM. Richard Ormsby admitted that he also knew that Kain had previously been involved in warranty claim fraud because he had been told that by a GM employee.

During 1992 and 1993, GM notified OMI that OMI had above-average warranty claims. Dave Beatty, the GM district service manager for the OMI dealership from June 1992 to June 1993, testified that part of his duties was to prepare "PICS reviews"[3] whenever a dealership is showing excessive warranty expense. A PICS review is completed and communicated to a dealership any time a dealership is above a certain percentage of warranty expense. In the case of OMI, Beatty first completed a PICS review in April 1993. He personally discussed the information regarding excessive warranty expense with Richard Ormsby and OMI's service manager. Both Ormsby and the service manager signed the PICS review, indicating they understood its meaning. Beatty also told Richard Ormsby that OMI was considered a project dealer, that is, a dealer that has exceeded warranty expense for three months. Additionally, as part of the PICS program, the Pontiac zone manager sends a letter to the dealership explaining that they are a project dealership, that Beatty will be working with the dealership to correct the warranty expense discrepancies and that the dealership is a potential audit candidate.

On April 21, 1993, R.L. Ackels, zone manager for the Pontiac division of GM, wrote Richard Ormsby and advised him that "[o]ver the last three months, warranty and frequency data tabulated for your dealership indicates that certain out-of-line conditions exist in the area of warranty administration when compared to national average." The

**2.** Larry Kain, the individual alleged to have actually falsified the warranty claims which ultimately led to GM's action in this case, refused to testify, invoking his Fifth Amendment right. Plaintiff offered into evidence under Fed.R.Evid. 804 both oral and written statements made by Kain. The court will address the admissibility of those statements later in this order.

**3.** PICS is an acronym for "partners in customer satisfaction."

letter further states that Pontiac district service manager, David Beatty, would be assigned to assist OMI management in correcting the deficiencies and that if there was no significant change after ninety days the dealership would be considered as a possible warranty audit candidate.

Following the letter, Beatty visited OMI and discussed with Richard and Thomas Ormsby the seriousness of the letter, the seriousness of being a project dealer and the possibility of a future audit. On May 4, 1993, Beatty visited OMI after noticing that OMI had a very high frequency of paint repairs of vehicles in stock with less than one hundred miles. Upon Beatty examining the files pertinent to those claims, it was revealed that there were no sublet receipts [4] for the paint repairs in the files. According to Beatty, Dwight Ormsby explained that the reason the sublet receipts were missing was because they were being completed by Richard Ormsby outside the dealership. At that point, Beatty advised one of the Ormsbys' that sublet receipts are to be completed by the vendor and not by anyone at the dealership. Beatty filled out another PICS review for OMI on May 14, 1993 because OMI remained in excess of warranty expense and because of Beatty's concern about the sublet receipts. Beatty again discussed his concerns about excess paint repairs with Richard Ormsby and the continued possibility of OMI being audited. Beatty had one more contact with Richard and Thomas Ormsby in late May or early June 1993 in which he discussed the continuing warranty claims problems and the possibility of an audit.

GM's dealer audit section conducted an audit of OMI's warranty claims between August 9, 1993 and August 19, 1993. The audit uncovered over eighty claims made to GM during that period for paint repair work that was never done. Additionally, the audit revealed over twenty claims made to GM in the past year for paint repair work in amounts that exceeded the amounts OMI was actually billed by the sublet repair facilities.[5]

On August 19, 1993, the auditors sat down with Richard Ormsby and informed him of the results of the audit and, in particular, the fact that many claims were made for warranty paint work that was never done. Ormsby offered no explanation for the false claims. When asked how the false claims could have happened, Ormsby shrugged his shoulders and gave no explanations. Between August 19 and October 13, 1993, the day the notice of termination was delivered, neither Richard or Thomas Ormsby offered any explanation for the false claims or audit results.

On October 13, 1993, Ackels wrote a letter to Richard Ormsby stating that the audit "uncovered that [OMI] had submitted false applications and claims to GM for payment and had in fact been paid for these claims." The letter further states that during the course of the audit the details of the false applications and claims were reviewed with Richard Ormsby or members of OMI's management and that representatives of Pontiac and GMC truck reviewed with Richard Ormsby a number of the false applications and claims as well as the overall results of the audit. According to Ackels' letter, Richard Ormsby had not disputed the false claims or offered any explanation as of October 13, 1993. The letter further notes that Ormsby had been given an opportunity to respond or explain following the August 19 meeting but he specifically chose not to. Lastly, the letter announces Pontiac's termination of the franchise agreement under section 14.5.5. Donald Buechler, zone manager for GMC truck division, wrote essentially the same letter to Richard Ormsby on October 13, 1993.

## DISCUSSION

### Admissibility of Kain's Statements

■ Upon Kain's assertion of his privilege against self-incrimination, OMI's attorney asked that Kain be declared unavailable under Rule 804 of the Federal Rules of Evidence and that the deposition of an investiga-

---

4. Sublet receipts are those receipts from the paint and body shops actually performing the paint repairs.

5. OMI does not have its own paint and body shop and sends its warranty work in that regard to outside body shops. OMI pays the body shops and, in turn, submits the claims to GM.

tor for GM's law firm and an unsworn, signed statement by Kain be admitted under Rule 804. The deposition contains the investigator's testimony concerning oral statements made by Kain and relating to the falsification of the warranty claims. Of particular relevance to this proceeding are the statements of Kain pertaining to the lack of knowledge and involvement of the Ormsby's. The unsworn statement by Kain contains references to his own involvement in falsifying the warranty claims as well as statements that the Ormsbys had no knowledge of or involvement in the falsification of warranties.

Initially, for any statement to be admissible under Rule 804, the declarant must be unavailable. Kain meets that initial criteria because of his invocation of his Fifth Amendment right. *See United States v. Garcia,* 986 F.2d 1135, 1139 (7th Cir.1993); *United States v. Moore,* 936 F.2d 1508, 1517 (7th Cir.1991).

Next, the only possible applicable exceptions under Rule 804 are the statement-against-interest exception, *see* Fed.R.Evid. 804(b)(3), and the other-exceptions exception, *see* 804(b)(5). To qualify a statement under Rule 804(b)(3), a declarant must be unavailable as a witness, the statement must be against the declarant's interest and there must be corroborating circumstances that clearly indicate the trustworthiness of the statement. *United States v. Groce,* 999 F.2d 1189, 1191 (7th Cir.1993); *United States v. Moore,* 936 F.2d 1508, 1516 (7th Cir.1991). As to Rule 804(b)(5), a hearsay statement is admissible if the declarant is unavailable and the statement contains circumstantial guarantees of trustworthiness equivalent to those inherent in the more specific exceptions provided under Rule 804(b)(1)–(4). *Moore,* 936 F.2d at 1517.

While plaintiff seeks to admit the investigator's deposition and Kain's statement in their entirety under Rule 804, the court considers it appropriate to examine the various statements of Kain referred to or contained within each. Other courts have similarly separated out statements under Rule 804 for the purpose of determining which portions satisfy Rule 804 and which do not. *See United States v. Porter,* 881 F.2d 878, 882 (10th Cir.1989); *United States v. Lilley,* 581 F.2d 182, 188 (8th Cir.1978); *see also McCormick's Handbook of the Law of Evidence* § 279, at 677 (E. Cleary 2d ed. 1972); *but cf. United States v. Curry,* 977 F.2d 1042, 1055–56 (7th Cir.1992) (inculpatory portion of statement as to co-conspirator A need not be redacted from remainder of statement where remainder qualifies as declaration against interest as to co-conspirator B, the declarant, and both statements are closely related). The separation approach is most consistent with the purposes of Rule 804 as it insures that only those hearsay statements with the specific guarantee of trustworthiness embodied by the Rule will be admitted. *See Porter,* 881 F.2d at 883.

■ In this case, Kain's statements that the Ormsbys did not know of or were not involved in the falsification of the warranty claims are easily severable from Kain's statements that he was involved. They are not so closely related to Kain's inculpatory statements regarding himself as to be incapable of standing on their own. Thus, the court must determine whether Kain's exculpatory statements regarding the Ormsby's are admissible under either Rule 804(b)(3) or 804(b)(5). *See Porter,* 881 F.2d at 883.

They do not qualify under Rule 804(b)(3) because they are not statements against Kain's (the declarant) interest. In fact, they are not statements against anyone's interest. Therefore, they are not admissible on that basis.[6]

■ They also are not admissible under Rule 804(b)(5) because they lack circumstan-

---

**6.** On the other hand, those portions of the deposition and unsworn statement in which Kain implicates himself in the preparation of false warranty claims are statements against Kain's interest and are therefore admissible under Rule 804(b)(3). While not of any evidentiary significance in light of this court's ruling, it is interesting to note that Kain's asserted reason for engaging in the false warranty scheme was a desire to recoup, on OMI's behalf, payments for certain legitimate warranty claims that had been previously denied by GM. According to Kain, he cooked up the scheme after Richard Ormsby had asked him to come up with an idea on how to recover the lost warranty claim payments. Kain did not advise Richard Ormsby of the ill-fated plan.

tial guarantees of trustworthiness equivalent to those inherent under Rules 804(b)(1)–(4). In that regard, the Seventh Circuit has recently enumerated seven factors that should be considered in determining whether hearsay testimony before a court has sufficient guarantees of trustworthiness under Rule 804(b)(5). *United States v. Seavoy*, 995 F.2d 1414, 1418 (7th Cir.1993). While some of these factors seem to apply only to testimony rather than an out-of-court statement, they have been referred to in the context of a non-testimonial statement, *see Moore*, 936 F.2d at 1517, and will thus be applied here to the extent applicable. Having considered the trustworthiness factors set forth in *Seavoy* in their entirety, the court finds those factors to weigh against admitting Kain's statements pertaining to the Ormsbys under Rule 804(b)(5).

Furthermore, Rule 804(b)(5) requires the court to consider whether the statement is offered as evidence of a material fact, whether the statement is more probative on the issue for which it is offered than any other evidence which the proponent can reasonably procure and whether the general purposes of the rules and the interest of justice will be best served by admitting the statement. These additional considerations also do not favor admissibility under Rule 804(b)(5). Accordingly, Kain's statements pertaining to the Ormsbys' lack of knowledge or involvement are not admissible under Rule 804(b)(5).

What has just been said is largely academic, however, as even if Kain's statements pertaining to the Ormsbys' lack of knowledge or involvement were admissible, it is only cumulative of the undisputed testimony of the Ormsbys that they had no knowledge of Kain's false warranty claims.

### Preliminary Injunction

■ The Seventh Circuit has most recently articulated the analysis applicable to a motion for a preliminary injunction in *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 313–16 (7th Cir.1994). A preliminary injunction is warranted if the movant can make a threshold showing that: (1) the movant has some likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) the movant will suffer irreparable harm if the injunction is not granted. *Farley Candy*, 14 F.3d at 313. If all three conditions are met, the court must then balance the harm to the movant if the injunction is not issued against the harm to the defendant if it is. *Farley Candy*, 14 F.3d at 313. Furthermore, the greater the movant's chance of succeeding on the merits, the less strong a showing it must make that the balance of harms is in its favor. *Farley Candy*, 14 F.3d at 313. Additionally, the court must consider the public interest in whether the injunction is or is not to be granted. *Farley Candy*, 14 F.3d at 313–14.

### I. Success On The Merits

■ To succeed on the merits of its claim, OMI must demonstrate that GM's decision to terminate the franchise agreement was not proper. In that regard, OMI has taken a two-pronged course. First, it contends that the termination was not authorized under the terms of the franchise agreement itself. Second, it maintains that the termination was not done with good cause under the Illinois Motor Vehicle Franchise Act, 815 ILCS 710/4(d)(6) (1993) (Act).

### A. Franchise Agreement

The section of the franchise agreement relied upon by GM for its termination is section 14.5.5 which states that GM may terminate the agreement if a dealer submits false applications or claims for any payment, credit, discount or allowance. It is undisputed that false claims for warranty work were submitted to GM and that OMI's open account was credited for those claims. What is disputed is whether OMI should be held responsible under the franchise agreement for those false claims where the OMI owners/officers deny knowledge or involvement in the making or submission of those false claims.

■ A case of particular instruction on this issue is *The Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273 (7th Cir.1992). In that case, the franchisees, who sought to

enjoin termination of a franchise agreement, argued that the violations giving rise to the termination were committed by their manager and were not their fault. *River Valley Cookies*, 970 F.2d at 279. Judge Posner rejected the argument, characterizing it as irrelevant. *River Valley Cookies*, 970 F.2d at 279. Liability for breach of contract is strict and does not require proof of inexcusable neglect or deliberate wrongdoing. *River Valley Cookies*, 970 F.2d at 279. Even if such proof was required, the franchisee would lose if the misconduct of the manager is within the scope of his employment as his misconduct would be attributable to the owner. *River Valley Cookies*, 970 F.2d at 279. Thus, such a case must be treated as if the franchisee had managed the store in person. *River Valley Cookies*, 970 F.2d at 279; *see also BeerMart, Inc. v. Stroh Brewery Co.*, 804 F.2d 409, 412 (7th Cir.1986).

Under the analysis of *River Valley Cookies*, OMI cannot escape responsibility for the actions of its warranty claims administrator even where, as here, the undisputed evidence shows no knowledge or involvement by OMI officers in his misconduct. Moreover, the facts here are even more compelling because, unlike in *River Valley Cookies*, the franchisees here were on location and were in a much better position to monitor Kain. Kain did a portion of his work on location and had a desk in the president's office. Under these circumstances, OMI cannot avoid responsibility under the franchise agreement for the false warranty claims submitted on its behalf by Kain.[7]

Additionally, there is further evidence to support a conclusion that OMI should be held responsible for Kain's illicit activities. Only about five years prior to OMI rehiring Kain as an independent contractor Kain had been dismissed by OMI for falsifying warranty claims unrelated to OMI with a GM official. Nevertheless, Kain was subsequently placed by OMI in charge of warranty claims and left completely unsupervised. He was given free access to the facility and was allowed to work at night. Also, prior to the audit in August 1993, OMI had received numerous monthly reports from GM regarding higher-than-average warranty claims and had also received correspondence from GM alerting them to the excessive warranty claims and the possibility of an audit. Furthermore, Beatty, the district service manager, had several personal contacts with the Ormsbys where he discussed the warranty claims problems and emphasized the seriousness of the matter. Apparently, and amazingly, nothing was done by OMI to investigate the warranty claims process or to deter the further submission of false or inflated claims. Lastly, even after the audit, OMI took no immediate action nor offered any explanation to GM regarding the false warranty claims. In fact, OMI did not terminate Kain until over a month after the audit results were released. Even then, OMI characterized Kain as merely a "warranty clerk." These additional facts make it evident that OMI not only placed Kain in the unsupervised position of preparing warranty claims when it knew of his past improprieties but it also allowed him to remain in that position after being made aware of the recent warranty claim irregularities. Consequently, OMI has simply failed to demonstrate any likelihood of succeeding on the merits of its claim that it is not responsible for the breach of the franchise agreement.[8]

## B. Illinois Motor Vehicle Franchise Act

■ Section 710/4(d)(6) of the Act provides, in relevant part: "It shall be deemed a

---

7. The court notes that in April 1987 Kenneth Ormsby signed on behalf of OMI an agreement to participate in the PICS program. As part of that agreement, Kenneth Ormsby expressly accepted responsibility for proper warranty and policy claims administration. Additionally, the dealer service manager and Thomas Ormsby signed the agreement as the individuals authorized to approve warranty claims. It is also curious to note that in a similar agreement entered into by OMI in 1985, Larry Kain signed as the then service manager.

8. The court finds *Semmers Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir.1970), relied on by OMI, to be unpersuasive because it is not controlling authority, is dated and is inconsistent with authority from the Seventh Circuit. In this latter regard, the case does not require a showing of any likelihood of success on the merits where the balance of hardships weighs in favor of the party seeking the injunction. 429 F.2d at 1205–06. This is clearly contrary to the established authority on the standard for preliminary injunctions in this circuit.

violation for a ... distributor ... (6) to cancel or terminate the franchise or selling agreement of a motor vehicle dealer without good cause ...." Good cause exists for terminating the franchise where a franchisee fails to substantially comply with the franchise agreement or where the franchisee commits a breach of contract that affects the franchisor's ability to market its product. *David Glen, Inc. v. Saab Cars USA, Inc.*, 837 F.Supp. 888 (N.D.Ill.1993) (citing *Kawasaki Shop of Aurora v. Kawasaki Motors Corp.*, 188 Ill.App.3d 664, 136 Ill.Dec. 4, 10–11, 544 N.E.2d 457, 463–64 (2d Dist.1989)).

Here, as discussed earlier, the evidence overwhelmingly shows that OMI breached a material term of the franchise agreement that gave GM the right to terminate the agreement. Such a breach as occurred here constitutes a failure to substantially comply with the franchise agreement; hence, good cause is shown. This is especially true where, as here, the violations occurred repeatedly and over a substantial period of time. Furthermore, while arguably an isolated incident by a "rogue employee" might in some circumstances not provide good cause for termination of a franchise agreement, here the evidence demonstrates that what occurred was more than an isolated incident and that OMI officials took no corrective action even after repeated reports by GM of claims problems. *See David Glen*, 837 F.Supp. at 891. Thus, OMI has failed to demonstrate any likelihood of succeeding on the merits of its argument that the termination of the franchise agreement was without good cause under the Act.

## II. Adequacy of Legal Remedy/Irreparable Harm

■ Because the court has concluded that OMI has not shown any likelihood of succeeding on the merits of its claims, the court need not determine whether OMI has shown inadequacy of a legal remedy and irreparable harm and may deny the motion on that basis alone. *See Farley Candy*, 14 F.3d at 313. Nevertheless, the court further finds that OMI has not demonstrated that it will be irreparably harmed if an injunction does not issue or that any harm it will suffer cannot be legally remedied. Its harm here will be loss of business and lost profits during the time it is not operating as a dealership. That type of damage is one capable of measure and subject to monetary compensation. There is no other suggestion by OMI as to how it will be damaged in any other way or how such damage is legally incompensable.

## III. Balance of Harm

■ Again, the court notes that it need not consider the balance of harms here as OMI has failed to make a threshold showing of some likelihood of success on the merits. The court does find, however, that the balance of harms weighs slightly in GM's favor. While OMI will lose money if the preliminary injunction is not issued, so will GM as it will be without a dealer in that franchise area. Moreover, if the preliminary injunction is issued, GM will be forced to continue to deal with OMI. This is a real and substantial harm. *See River Valley Cookies*, 970 F.2d at 277. The evidence established that the relationship between GM and its franchise dealers depends on trust. For example, GM maintains an open account with OMI for financial transactions, including warranty claims and payments. That system allows for claims without documentation to be made and provides for reimbursement for those claims without any further information provided to GM. Of course, OMI must keep records in the event of an audit. It is apparent that the trust relationship necessary to such financial transactions and operating procedures has been severely damaged here. GM cannot be expected to continue to operate under such conditions at this point in the litigation. Accordingly, the balance of harms, while arguably close, favors the denial of the motion for preliminary injunction especially as no likelihood of success on the merits has been shown.

## CONCLUSION

For the foregoing reasons, OMI's motion for a preliminary injunction is denied.